**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                          *Petitioner*,

        - against -

DAVID RIVARD,

                         *Respondent*.

Case No. 15 MC 0221 (ILG)
ECF CASE

---

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                          *Plaintiff*,

        - against -

DAVID RIVARD,

                         *Defendant*.

Case No. 04 Civ. 1464 (ILG)
ECF CASE

---

**MEMORANDUM OF LAW IN OPPOSITION TO U.S. SECURITIES AND EXCHANGE
COMMISSION'S APPLICATION FOR ENFORCEMENT OF 2004 COMMISSION
ORDER AND 2004 FINAL JUDGMENT AND OTHER RELIEF**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
John K. Carroll
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel for David Rivard*

## Table of Authorities

Page(s)

**CASES**

*Badgley* v. *Santacroce*,
800 F.2d 33 (2d Cir. 1986)..........................................................................45

*Bowles v. Seminole Rock & Sand Co.*,
325 U.S. 410 (1945) ....................................................................................23

*Equal Employment Opportunity Commission v. Local 638...28 of Sheet Metal Workers'*
*International Association*,
753 F.2d 1172 (2d Cir. 1985)......................................................................45

*Grand Jury Subpoena John Doe v. United States*,
150 F.3d 170 (2d Cir. 1998).........................................................................46

*Guidry v. Sheet Metal Workers National Pension Fund*,
493 U.S. 365 (1990) ....................................................................................47

*Heath v. SEC*,
586 F.3d 122 (2d Cir. 2009).........................................................................23

*Huber* v. *Marine Midland Bank*,
51 F.3d 5 (2d Cir. 1995) ..............................................................................46

*Kelley v. Environmental Protection Agency*,
15 F.3d 1100 (D.C. Cir. 1994) .....................................................................24

*Marrie v. SEC*,
374 F.3d 1196 (D.C. Cir. 2004) ...................................................................28

*National Labor Relations Board v. Brown*,
380 U.S. 278 (1965) ....................................................................................23

*SEC v. AbsoluteFuture.com*,
393 F.3d 94(2d Cir.), *supplemented*, 115 F. App'x 105 (2d Cir. 2004) ..........................44

*SEC v. Contorinis*,
743 F.3d 296 (2d Cir. 2014)....................................................................43, 44

*SEC v. Elliott*,
No. 09 CIV. 7594(RJH), 2011 WL 3586454 (S.D.N.Y. Aug. 11, 2011) .........................44

*SEC v. First Jersey Securities, Inc.*,
101 F.3d 1450 (2d Cir. 1996).......................................................................44

i

*SEC* v. *House Asset Management, LLC*,
No. 02-2147, 2004 WL 2126318 (C.D. Ill. Sept. 17, 2004) .............................................45

*SEC* v. *Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972) ..................................................................................................49

*SEC* v. *Musella*,
818 F. Supp. 600 (S.D.N.Y. 1993) ....................................................................................46, 47

*SEC v. Prince*,
942 F. Supp. 2d 108 (D.D.C. 2013) ..................................................................................passim

*SEC v. Tourre*,
4 F. Supp. 3d 579 (S.D.N.Y. 2014) ........................................................................................44

*SEC* v. *Unified SAL*,
910 F.2d 1028 (2d Cir. 1990) ..................................................................................................48

*SEC* v. *Whittemore*,
691 F. Supp. 2d 198 (D.D.C. 2010), *aff'd*, 659 F.3d 1 (D.C. Cir. 2011).........................45

*United States v. Irving*,
452 F.3d 110 (2d Cir. 2006) ......................................................................................................47

## STATUTES

15 U.S.C. § 78o ..............................................................................................................................5

15 U.S.C. § 78o(d) ..........................................................................................................................5

18 U.S.C. § 3613(a) ......................................................................................................................47

29 U.S.C. § 1056(d)(1).................................................................................................................47

## REGULATIONS

17 C.F.R. § 201.102(e)(3)(i) (2015)........................................................................................4, 25

17 C.F.R. § 201.102(f)(2) (2015) ................................................................................................26

## OTHER AUTHORITIES

*In the Matter of James M. Schneider, CPA*,
Exchange Act Release No. 69922, 2013 WL 3327751 (July 2, 2013)............................26

*In the Matter of Robert W. Armstrong, III,*
Exchange Act Release No. 51920, 85 SEC Docket 2321,
2005 WL 1498425 (June 24, 2005) ....................................................................................passim

Application, *SEC v. Taber*,
    No. 1:13-mc-00282-KBF (S.D.N.Y. filed Aug. 8, 2013), ECF No. 1 ............................43

Complaint, *SEC v. Jones*,
    No. 1:13-cv-00163-BSJ (D. Utah filed Nov. 21, 2013), ECF No. 2.............. 27, 32, 40, 43

Memorandum Decision & Order, *SEC v. Taber*,
    No. 1:13-mc-00282-KBF (S.D.N.Y. filed Dec. 4, 2013), ECF No. 19.....................44, 45

Minute Entry, *United States v. Rivard*,
    No. 1:04-cr-00329-ILG-1 (E.D.N.Y. filed Apr. 8, 2004), ECF No. 4 ...............................4

Transcript of October 2, 2013 Hearing, *SEC v. Taber*,
    No. 1:13-mc-00282-KBF (S.D.N.Y. filed Mar. 12, 2014), ECF No. 21.....................6, 44

David Rivard respectfully submits this Memorandum of Law in opposition to the United States Securities and Exchange Commission's ("SEC" or the "Commission") application dated February 5, 2015 for an order (i) enforcing compliance by Rivard with the Commission's order of October 27, 2004 barring Rivard from appearing or practicing before the Commission as an accountant (the "2004 Commission Order" or "102(e) Order"); (ii) requiring Rivard to disgorge compensation he obtained from alleged violations of the 2004 Commission Order, plus prejudgment interest; (iii) holding Rivard in contempt of this Court's November 4, 2004 Final Judgment by Consent (the "2004 Final Judgment"); (iv) ordering Rivard to purge the contempt or be sanctioned and (v) ordering an asset freeze and directing Rivard to provide an accounting. For the reasons set forth below, Rivard respectfully requests that the Court deny the Commission's application.

## PRELIMINARY STATEMENT

Rivard, through his counsel, has conveyed to the Commission his interest in resolving this matter without litigation. In an effort to begin a dialogue about a potential resolution, and at the Commission's request, Rivard has completed and submitted a detailed personal financial statement (the "Financial Statement"), accompanied by supporting documentation. Rivard is also prepared not to contest that certain limited tasks that he briefly performed while employed at Verint Systems Inc. ("Verint") violated the 2004 Commission Order. Rivard files this response principally because the Commission has asked to review Rivard's response as it evaluates Rivard's Financial Statement and considers a potential resolution of these matters.

In its application, the Commission asserts that all of Rivard's activities at Verint – for the duration of the five-year period that he was employed there – constitute practicing accounting before the Commission, in violation of the 2004 Commission Order and Rule

102(e)(3)(i) of SEC Rules of Practice & Rules on Fair Fund and Disgorgement Plans ("Rules" or "Rule").  This Court should reject the Commission's effort to extend the reach of Rule 102(e) to conduct that is significantly attenuated from the preparation of filings submitted to the Commission and that merely has some impact – or some potential impact – on a public company's financial statements.  This Court should also reject the Commission's related request for disgorgement of just over $984,000 – Rivard's total pre-tax compensation received from Verint – plus prejudgment interest.  The vast majority of Rivard's activities while at Verint plainly did not violate the 2004 Commission Order because they did not constitute practicing accounting before the Commission within the meaning of Rule 102(e). Therefore, Rivard should not be required to disgorge his Verint compensation in its entirety.  Furthermore, Rivard lacks the financial ability to pay the disgorgement amount that the Commission seeks, and given his financial situation and his employment prospects, it is unlikely that Rivard will ever be able to pay that amount.

Indeed, Rivard also does not have the financial ability to pay the disgorgement and prejudgment interest amount as ordered in this Court's 2004 Final Judgment – $83,700.96 in total.[1]  Therefore, this Court should deny the Commission's request for an order holding Rivard in contempt of court for his failure to pay that amount and should deny the Commission's request that Rivard be required to purge himself of contempt by payment.  As the Financial Statement that Rivard recently submitted to the Commission makes clear, Rivard's liabilities exceed his

---

[1]    The 2004 Final Judgment also included a $75,000 civil penalty, as well as post-judgment interest.  Due to interest and penalties, the total amount of the judgment has increased considerably since it was imposed.

assets, and his present income is insufficient to cover his expenses.[2]   Furthermore, and for the

reasons discussed further herein, an accounting and an asset freeze are also unwarranted.

---

[2]   The Financial Statement that Rivard submitted to the Commission on April 9, 2015 is attached as Exhibit A hereto.  After submitting this Financial Statement on April 9, Rivard obtained additional financial information and bank account statements.  A supplement to the Financial Statement reflecting this updated information is attached as Exhibit B hereto.

## STATEMENT OF FACTS[3]

### I.    The 2004 Commission Order and 2004 Final Judgment Against Rivard

On April 8, 2004, the Commission filed an action against Rivard charging that, while serving as Vice President and head of the Sales Accounting Department at Computer Associates ("CA"), Rivard participated in wrongful conduct by approving the accelerated booking of revenues that should have been booked in subsequent quarters.  (SEC Ex. 4.)  On that same date, Rivard was criminally charged by the United States Attorney's Office for the Eastern District of New York on related charges arising from the same conduct.  In that proceeding, Rivard pleaded guilty to one count of conspiracy to commit securities fraud and one count of conspiracy to obstruct justice.   Minute Entry, *United States v. Rivard*, No. 1:04-cr-00329-ILG-1 (E.D.N.Y. filed Apr. 8, 2004), ECF No. 4.  Rivard cooperated in that investigation, providing information that contributed to the successful prosecution of several CA executives who orchestrated or participated in the fraudulent scheme and subsequent cover-up.  He ultimately received a sentence of four months of home detention and three years of supervised release.

On October 27, 2004, the Commission instituted administrative proceedings against Rivard pursuant to Rule 102(e)(3)(i) of the Commission's Rules of Practice, 17 C.F.R. § 201.102(e)(3)(i) (2015), and issued an order suspending him from "appearing or practicing before the Commission as an accountant" (the "2004 Commission Order").  (SEC Ex. 2.)  On November 4, 2004, this Court entered a final judgment in the Commission action, to which Rivard consented without admitting or denying the allegations against him (the "2004 Final Judgment").  (SEC Ex. 3.)  Rivard was permanently enjoined from violating certain provisions of

---

[3]    The facts are supported by the Declaration of John K. Carroll, dated April 29, 2015, with attached exhibits ("Dec." and "Ex.").

the federal securities laws and prohibited  from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 12 of the Exchange Act, 15 U.S.C. § 78o, or that is required to file reports pursuant to section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).  (*Id.*)  The 2004 Final Judgment also ordered Rivard to disgorge $65,000 in ill-gotten gains plus prejudgment interest of $18,700.96 and to pay a civil penalty of $75,000, totaling $158,700.96.  (*Id.*)  Thereafter, Rivard surrendered his Certified Public Accountant license to the State of New York, at the request of the New York State Department of Education.  (SEC Ex. 6 at 21.)

## II.     Rivard's Employment at Verint

After leaving CA, Rivard had difficulty finding employment.  Ultimately, he found work at a number of different recruiting businesses.  In 2007 he joined the corporate recruiting firm Trandon Associates.  (SEC Ex. 6 at 23-24.)  Rivard remained in touch with a colleague and Senior Vice President in Finance at CA, who later became the Chief Financial Officer of Verint.  (*Id.* at 25.)  In approximately April 2009, Rivard began working at Verint as a consultant.  (*Id.* at 27.)

When Rivard arrived at Verint, he understood that he was prohibited from serving as an officer or director of a public company, (SEC Ex. 6 at 18, 224), or as an external auditor for a publicly listed company, (*id.*), and that he could not sign the certifications that are included in SEC filings.  (*Id.* at 14.)  To the extent that Rivard considered the specific restrictions of the 102(e) Order at the time it was imposed in October 2004, he essentially understood that he could not practice before the Commission in the sense that he could not sign documents filed with the

Commission and could not serve as an outside auditor for a public company. (*Id.* at 14, 18, 224.)[4]

When Rivard joined Verint as a consultant, Rivard knew that Verint was aware that Rivard had pled guilty to illegal conduct in connection with his work at CA. Rivard was interviewed by senior Verint employees prior to becoming a consultant, and he understood that they were generally aware of his situation. (*Id.* at 34-36.) When Rivard became a consultant at Verint – and later, a full-time employee – he did not believe that the tasks he performed were prohibited. (*Id.* at 40, 231-32.) Nevertheless, due to Rivard's conduct at CA, Verint imposed substantial restrictions on Rivard's responsibilities. (SEC Ex. 7 at 36, 56, 63-65, 82.) Throughout his time at Verint, Rivard was kept in a subordinate role to ensure that his work was carefully vetted and that any substantive recommendations he made were closely reviewed. (*Id.* at 36. 56, 62-65, 87-88, 107-08.) Rivard had no direct reports, and his supervisor had to approve his work product and any substantive judgments before Rivard could convey those judgments to others. (Ex. N at 25-26, 28, 40, 43-44.)

## III.    Rivard's Duties & Responsibilities at Verint

Verint first hired Rivard as a consultant in April 2009, (SEC Ex. 6 at 27); he was hired as a full-time employee in November 2010. (*Id.* at 58.) Rivard was terminated in April 2014, for reasons unrelated to this matter, and is currently working as a corporate recruiter.

---

[4]    Rivard's 102(e) Order, which was entered against him in October 2004, predates *In the Matter of Robert W. Armstrong, III*, Exchange Act Release No. 51920, 85 SEC Docket 2321, 2005 WL 1498425 (June 24, 2005). In *Armstrong*, the Commission significantly broadened its interpretation of what constitutes "appearing or practicing before the Commission" as an accountant under Rule 102(e), addressing for the first time the meaning of Rule 102(f) and concluding that "preparation" within the meaning of 102(f) was "sufficiently broad to encompass the preparation of data to be included in a document filed with the Commission, at least where, as here, the data was prepared for the express purpose of being included in such a document." *Armstrong* at *11; *see also* Transcript of October 2, 2013 Hearing at 6, *SEC v. Taber*, No. 1:13-mc-00282-KBF (S.D.N.Y. filed Mar. 12, 2014), ECF No. 21.

During the five-year period that Rivard was employed at Verint, almost everything that Rivard was asked to do did not implicate the terms of the 2004 Commission Order and Rule 102(e).  Rivard used his accounting skills at Verint in certain limited respects, and much of his work had some attenuated relationship to Verint's financial statements that were included in Verint's public filings with the Commission.  But the 102(e) Order did not prohibit Rivard from practicing as an accountant, nor did it prohibit engagement in any activity that could be said to impact financial statements, and thus public filings, in some attenuated way.

Rivard's work at Verint falls into four roughly distinct time periods.  First, from April 2009 through November 2009, Rivard was a consultant at Verint, working in a team tasked with work relating to Verint's Restatement of its publicly filed financial statements for fiscal years 2006, 2007 and 2008, among other responsibilities.  (*Id.* at 27-28.)  Second, from November 2009 until early 2011, Rivard, under the supervision of the Director of Business Finance for Verint's Video Intelligence Solutions ("VIS") Operating Segment, handled tasks relating to revenue recognition compliance and the quarterly close process.  (SEC Ex. 6 at 117; SEC Ex. 7 at 81; Ex. N at 42-43.)  In the middle of this period, in November 2010, Rivard was hired as a full-time Verint employee.  (SEC Ex. 6 at 58.)  Third, beginning in early 2011, Rivard was tasked with drafting initial updates to established Verint policies and worked on a team to customize and implement "Revstream" – an automated revenue recognition system that Verint had purchased from a third-party software company.  (Ex. N at 45, 52-53.)  Rivard also responded to requests from Verint's outside auditors, Deloitte & Touche ("Deloitte"), for certain documents relating to Deloitte's audit and occasionally (and generally with the input of others) responded to questions raised by Deloitte in the course of their work.  (SEC Ex. 6 at 103-04; Ex. N at 112-18.)  Fourth, in January 2013, Rivard's supervisory structure changed when the

Director of Business Finance for the VIS Operating Segment left Verint and in July 2013, Rivard began to transition his Revstream and quarterly close work to another Verint Operating Segment, though he continued to do certain revenue recognition work through April 2014, when he left Verint.

As set forth further below, it is understandable that Rivard, as a lay person, did not regard his work as crossing the ambiguous line drawn by Rule 102(e).

### A.   Reviewing and Re-Categorizing Historical Transactions

For the first few months as a consultant, Rivard worked as a member of a team of consultants (some not accountants) to review Verint's historical contracts by reference to specific categories designed by others, to assess whether the contracts were properly categorized, and if necessary, to re-categorize them for purposes of Verint's Restatement.  (SEC Ex. 6 at 232-35, 237-39.)  Rivard categorized contracts based on certain objective factors that did not require him to use his accounting skills – for example, he separated contracts for hardware from contracts for software.  (*Id.* at 234-36.)  Then, through an automated process independent of Rivard, revenue recognition rules were applied to the contracts, (*id.* at 234), and the resulting revenue figures were used in connection with the preparation of Verint's Restatement.  This task did not require Rivard to work on the financial statements for the Restatement filing itself.

### B.   Assisting with Two Footnotes in Verint's Restatement

While working as a consultant, Rivard was asked to review and confirm the accuracy of two footnotes in Verint's Restatement.  Rivard was provided with drafts of the "Special Charges" footnote and "Investments" footnote and was tasked with compiling specific documentation relating to the numbers in the footnotes and with checking the accuracy of the numbers against that documentation.  (*Id.* at 44-45, 46.)  Rivard located the supporting information and compared it to the numbers in the footnotes.  (*Id.* at 47-48.)

Rivard corrected typographical errors in the footnotes and reviewed supporting documentation to confirm the accuracy of certain numbers therein. (*Id.* at 45-46.) With respect to the "Investments" footnote, he proposed a correction to a number that was not consistent with the supporting documentation, and proposed a word change. (SEC Ex. 6 at 68; SEC Ex. 17.) At least one of Rivard's proposed changes does not appear in the final version of the document. (SEC Ex. 16b.) Rivard also appears to have conveyed some comments on the "Special Charges" footnote to Verint's Vice President of Global Accounting who incorporated those comments though the nature of those comments is unknown. (SEC Ex. 18.)

According to the metadata, both footnotes were modified numerous times after Rivard made his last modification to each of them – indeed the documents were accessed and modified by others far more often than they were by Rivard. The "Special Charges" footnote was modified 108 times in total by multiple Verint employees. (*Id.*) Rivard modified the document on six occasions and the document was modified 39 times after Rivard last modified it. (*Id.*) The "Investments" footnote was modified 104 times in total by multiple Verint employees. (SEC Ex. 17.) Rivard modified the document on eleven occasions and the document was modified 60 times after Rivard's last modification. (*Id.*)

**C.    Preparing a Draft of Verint's Related Party Transactions Policy**

After Rivard completed his work on the Restatement, the SVP of Corporate Finance asked him to prepare an initial draft of a Company-wide policy with respect to related party transactions. (SEC Ex. 6 at 247-48.) The purpose of this document was to describe the Company's policies and procedures with respect to identifying, communicating and recording related party transactions and appropriately disclosing these transactions in accordance with GAAP, SEC rules and other applicable regulations.

At various times from approximately October 2009 to January 2010, Rivard worked on this draft policy with the assistance of the Internal Audit Manager.  To prepare the draft, Rivard reviewed Verint's existing practices and approaches to related party transactions across business units, similar policies from other companies and sample policies obtained from the websites of large accounting firms.  (*Id.* at 248-49, 250-51.)  Rivard's work was supervised by Verint's Chief Accounting Officer, and his draft was reviewed and revised by multiple senior employees at Verint, including Verint's General Counsel, its SVP and Corporate Controller, the regional controllers in the U.S., Canada, Israel, UK, and Hong Kong, and Verint's Chief Financial Officer.  (Ex. C.)  Verint referenced this policy in its Restated Form 10-K filed in March 2010 and in other public filings in subsequent years, but Rivard did not draft or edit these aspects of the public filings.

> **D.      Reviewing the Booking of VIS Contracts**

In approximately November 2009, Rivard was assigned to assist the Director of Business Finance for the VIS Operating Segment.  (SEC Ex. 7 at 81, 85; Ex. N at 42-43.)  At that time, Verint's Finance Department was subdivided into a number of groups or units, including Business Finance, Controller, Tax and Treasury.  The Controller Group included a Global Revenue Controller, who reported to the SVP and Corporate Controller.  The Controller Group was responsible for Verint's financial reporting and the Global Revenue Controller was responsible for reviewing all of Verint's customer transactions above a certain threshold, as well as certain other lower value contracts, for proper revenue recognition treatment.  The Global Revenue Controller was also responsible for making any necessary changes to Verint's revenue processes, systems and records.  The Controller Group was also primarily responsible for Verint's accounting policies and its relationship relative to revenue accounting with Deloitte.

The Business Finance Unit, by contrast, was divided into three teams that each aligned with one of Verint's three operating segments, including the VIS Operating Segment.  VIS has eight separate business units in different regions worldwide.  Rivard, as well as others who reported to the Director of Business Finance, served a compliance-type function for the VIS Operating Segment, pertaining to revenue recognition.  They reviewed revenue recognition determinations on a regular basis to ensure that they were consistent with the existing policies for the VIS Operating Segment.  They reported any errors to the appropriate area of the business, as well as to the Global Revenue Controller.

Prior to the implementation of Revstream, Rivard and the other members of the VIS Business Finance team were not permitted to correct any errors themselves, as they were functionally unable to post adjustments to the General Ledger balances for the businesses within the VIS Operating Segment.  The Business Finance team could only review transactions for proper revenue recognition treatment after the Order Management teams within the VIS business globally posted transactions to the General Ledger.  Once Revstream automated the application of revenue recognition rules to contracts that Order Management teams had previously performed manually, Rivard's main role was to review transactions that were incorrectly processed in Revstream and provide an initial diagnosis of the error, along with analyzing transactions that were placed on "hold" by the automated process.  Rivard would then release the "hold" in Revstream and document the transaction, along with a description of the factual circumstances of the "hold," on a spreadsheet.  (SEC Ex. 6 at 170-72, 319-21.)  After the implementation of Revstream, Rivard still did not have the authority or the functional ability to post entries to the General Ledger.  Rivard's release of a "hold" in Revstream did not record the revenue from that transaction on the General Ledger.  Rivard's supervisor, the Director of

11

Business Finance, would review the factual circumstances of the "hold" that were documented in the spreadsheet, and if he approved Rivard's release of the "hold," he would personally enable the entries from Revstream to be posted to the General Ledger.  (*Id.* at 321, 324-25, 329-30.)

From approximately November 2009 to February 2011 (spanning his conversion from a consultant to a full-time employee), prior to the launch of Revstream, Rivard's principal task was to review transactions within the VIS business by reference to a step-by-step revenue recognition guidance document known as a "Decision Tree," to ensure that business units that originally entered the transactions in their General Ledgers had done so in accordance with the steps in the document.  (SEC Ex. 6 at 252-53, 254-56; 262-64; Ex. D.)  The task took up the vast majority of Rivard's time during this period and was sometimes shared with other consultants hired by Verint, (SEC Ex. 6 at 256-58), some of whom were not accountants.  The Director of Business Finance prepared the Decision Tree documents, (*id.* at 252-53); Rivard had no input into the drafting or design of the Decision Trees and he proposed no changes to their content, other than perhaps minor word changes or clarifications.  (*Id.* at 253-54.)  Rivard did not decide how the transactions should be entered into the General Ledger and how revenue should be recognized – that was the responsibility of the Order Management teams within the VIS business globally.  (*Id.* at 252-53, 254.)  Those teams were guided by the same Decision Tree document with which Rivard conducted his review.  (*Id.* at 252-53.)

Rivard conducted his review – a rote, administrative exercise (*id.* at 255) – under the close supervision of the Director of Business Finance.  (*Id.* at 264-65.)  Rivard reviewed a spreadsheet describing the revenue recognition treatment for each contract and used the spreadsheet to note any errors.  (*Id.* at 261-62; 264.)  He then sent the spreadsheet to his supervisor for his review and approval and awaited his instructions.  (*Id.* at 264-65.)  Typically,

12

once reviewed and approved, and if so directed, Rivard would contact the business unit in the relevant region to report any errors; sometimes his supervisor conveyed this information on his own. (*Id.*) The business units within VIS had discretion to accept or reject the proposed changes and to post any necessary entries to that business unit's General Ledger. (*Id.* at 266.) The Vice President of Business Finance – or, with respect to those business units located outside of North America, the local controllers – ultimately were responsible for resolving any disagreement between Rivard or other members of the team and the business units with respect to proposed changes. (*Id.*) Typically, the team's proposed changes were accepted. (*Id.* at 267.) Rivard's contract-by-contract review, which he conducted on a daily or weekly basis, was substantially removed from the preparation of the VIS Operating Segment's financial statements for inclusion in Verint's public filings. Indeed, Rivard was not even allowed (or functionally able) to post changes regarding the revenue recognition for a particular contract to the General Ledger of a business unit.

Beginning in early to mid-2010, Rivard was tasked with completing a revenue recognition Checklist (the "Checklist(s)") for contracts exceeding certain threshold dollar amounts. (*Id.* at 86-88, 92-93.) Rivard completed the Checklists by checking the appropriate boxes and adding narrative descriptions where required. (Ex. E.) The Checklist, once completed, described the revenue recognition treatment applied to the contract. (SEC Ex. 6 at 94.) The Director of Business Finance for the VIS Operating Segment, the Global Revenue Controller, the SVP of Business Operations for the VIS Operating Segment, and, in the event of an international transaction, the international controller or Business Unit CFO, all reviewed the Checklists to ensure that revenue was recognized correctly for each of the contracts. (*Id.* at 95.) If Rivard noticed an error in the revenue recognition treatment of a contract while he was

13

completing the Checklist, Rivard would discuss that with the Checklist reviewers, who would

determine whether changes needed to be made.  If changes needed to be made, Rivard would

convey those changes to the business unit after meeting with the Checklist reviewers and

receiving their approval to do so.  Rivard also met with his supervisor – the Director of Business

Finance for the VIS Operating Segment – on a weekly basis to review all transactions in the VIS

business unit, which were displayed in a spreadsheet file as discussed above, to ensure that

revenue was properly recognized for those transactions.  (*Id.* at 97.)  In those meetings, Rivard

could identify any perceived errors in revenue recognition, even if such potential errors were also

reflected on the Checklists.  (*Id.* at 97.)

       As a consultant and thereafter as a full-time employee, Rivard assisted Verint's

Internal Audit Department with its Sarbanes-Oxley ("SOX") documentation of the risks and

internal controls in the Restatement process and the VIS revenue recognition process.  Rivard

signed quarterly SOX sub-certifications in connection with his work on the Restatement project.

Once he transitioned into a revenue recognition compliance role in the VIS business, Rivard

signed SOX sub-certifications in which he confirmed certain facts about the policies and

practices pertaining to revenue recognition within the VIS business, and in particular confirmed

that certain controls were in place.  (SEC Ex. 6 at 69-70, 71-72, 192-93; *see, e.g.*, SEC Ex. 23a-

k.)

       Rivard also provided comments on draft narratives prepared by Internal Audit that

described the process of revenue recognition in the VIS business and sometimes updated the

narratives to correctly reflect new internal controls in that process.  (SEC Ex. 6 at 82-85; *see,*

*e.g.*, SEC Ex. 25.)  Rivard's supervisor, the Director of Business Finance, reviewed Rivard's

14

comments and provided his own comments either in person or by email.  (SEC Ex. 6 at 84, 192; Ex. N at 58-60.)

In or around February 2010, Rivard was designated a "process owner" for the VIS revenue recognition process narrative, along with his supervisor and the Global Revenue Controller.  (Ex. N at 106-07; *see, e.g.*, SEC Ex. 24a-b.)  "Process owners" had responsibility for reviewing and updating the process narratives on a quarterly basis and often participated in the processes described in the narratives.  (Ex. N at 106.)  Rivard, accompanied by his supervisor, the Global Revenue Controller, and the VP of Business Finance, sometimes met with Internal Audit and the Company's external auditor, Deloitte, to discuss the annual audit of the VIS revenue recognition process narrative.  They typically discussed changes to be made to the narrative to reflect new processes or internal controls, and Internal Audit would then modify the narrative accordingly.  Thereafter, the narrative was sent to Deloitte in connection with its audit of the financial statements.  On a quarterly basis, Rivard would make any necessary changes to the VIS revenue recognition process narrative, give the narrative to his supervisor for his review, and then, once the changes were approved, send the narrative to Internal Audit.

After it became operational in February 2011, Revstream (an automated revenue recognition review system) did most of the revenue recognition work that Rivard previously handled.  In particular, Rivard no longer reviewed each transaction to determine whether Order Management had booked it correctly according to appropriate revenue recognition rules codified in the Decision Trees because Revstream applied those rules automatically.  Rivard did continue to complete revenue recognition Checklists for contracts above particular thresholds, and these Checklists continued to be reviewed by senior members of the Finance Department.

Rivard's primary responsibilities post-Revstream consisted of reviewing transactions that were incorrectly processed in Revstream and reviewing "holds" on transactions within the system.  (SEC Ex. 6 at 170-72; 319-20.)  On a daily basis, Rivard would review those "held" transactions and release some of them in Revstream.  (*Id.* at 320-22, 323-24.)  Generally, determining whether a hold could be released did not require the application of revenue recognition rules to a transaction.  (*Id.* at 322.)  The majority of holds related to factual issues – for example, a customer known to be slow to pay for products could be placed on a hold.  (*Id.* at 323.)  Rivard would investigate to determine whether the customer had paid; if so, he would recommend that the hold be released.  At the end of each week, Rivard would present a spreadsheet documenting the "holds" he had released, along with a summary of the factual circumstances of the "hold" to his supervisor, the Director of Business Finance.  Rivard's supervisor would review the transactions on the spreadsheet, and then make a decision whether to post the transaction to the General Ledger.  (*Id.* at 321, 324-25, 329-30.)  Sometimes, in addition to reviewing the spreadsheet, he would review the transaction in Revstream himself.  Only the Director of Business Finance had the authority to approve and cause the previously-held transaction to flow through to the General Ledger.  (*Id.* at 329-30.)  Rivard had no functional ability or authority to cause a transaction to flow through to the General Ledger under any circumstances.[5]  The task of reviewing holds, which generally did not require the application of accounting rules to the "held" contract, also had no direct relationship to Verint's public filings.

---

[5]   While Rivard had the authority to release "holds" within Revstream, releasing a hold did not result in a transaction being posted to the General Ledger.  It simply changed the transaction's status within Revstream.  If the transaction had previously been subject to a "hold" (which Rivard then released), only Rivard's supervisor could both authorize clearance of the "hold" and cause the transaction to be posted to the General Ledger.

### E.      Supporting Others in the Quarterly Close Process for the VIS Business

Both as a consultant and later as a full-time employee, Rivard had limited responsibilities with respect to the quarterly close process within Verint's VIS business segment. For example, Rivard would review the trial balances and the General Ledger to confirm that any proposals made to the business units during the quarter regarding revenue recognition had been followed, and that any necessary changes had been posted to the General Ledger. (*Id.* at 168-69.) After he completed his review, Rivard would report his findings and any proposed changes to his supervisor. If Rivard's supervisor agreed with Rivard's recommendations, he would task Rivard with conveying the proposed change to the VP of Business Finance or the local international controllers (depending on the region of the business unit to which the change pertained), so that they could post a journal entry making the proposed change. In addition, Rivard reviewed and reconciled other balances in connection with the quarterly close. For example, he analyzed the relationship between deferred revenues and deferred cost of goods sold and if the relationship between the two seemed unreasonable to him, he conducted research to identify the cause of the imbalance. In these and other close-related tasks, Rivard was directed by his supervisor and presented his findings to his supervisor, who was required to review and approve Rivard's recommendations before they were passed on to others. (*See, e.g.*, Ex. F; Ex. G.)

Following the implementation of Revstream in February 2011, Rivard's close-related activities changed to some extent. He was tasked with confirming that 1) all holds were cleared in the Revstream system as directed by his supervisor, 2) miscellaneous Revstream-related issues were addressed (also with his supervisor's approval), and 3) any additional investigative work required to resolve those issues was completed. The majority of close-related tasks both before and after Revstream's implementation – such as the review and reconciliation

processes described above – were handled within the Business Finance Department and did not require additional input from the business units prior to the final approval of Rivard's supervisor.

Rivard was also responsible for reviewing a system report called the short-term/long-term netdown report that netted off all unpaid (open) accounts receivable against all deferred revenue numbers for all eight business units within VIS, then categorized the net figures as short-term or long-term. (SEC Ex. 6 at 338.)  Rivard performed a spot check of the numbers and, if needed, requested that certain balances be reconciled with the numbers in the General Ledger.  (*Id.* at 338-39.)  Because his supervisor's review could not be completed before the business units provided input to the short-term/long-term netdown report, Rivard sent the report with his preliminary comments first to the business units, with his supervisor copied, and then to his supervisor after the business units had completed their review and provided input.  Rivard's supervisor then simultaneously reviewed Rivard's recommendations (if any) and the business units' input (if any) and then gave his final approval for the report.  (*Id.* at 339; Ex. H.)

For example, in February 2011, Rivard reviewed the short-term/long-term netdown figures for the Asia Pacific field office, provided comments to a local accounting staff member, and asked her to consider reclassifying some short-term deferred revenue as long-term deferred revenue if she agreed with his analysis.  (SEC Ex. 6 at 212-15; SEC Ex. 28.)  Rivard included not only his supervisor but also the SVP of Business Finance for Asia Pacific and the VP and Global Revenue Controller on these communications.  (*Id.*)  Furthermore, upon receiving Rivard's comments, the Asia Pacific accounting staff member reached out to the Global Revenue Controller for instructions on how to reclassify this deferred revenue.  (*Id.*)

Rivard was also responsible for reviewing a file reflecting the revenue recognition determinations made by controllers in the German entity within VIS, because the customer contracts in Germany had unique features that required additional analysis of revenue recognition at the end of the quarter.  (SEC Ex. 6 at 155-56.)  As with his performance of other close-related tasks, any comments that Rivard made on the German entity's transit file had to be reviewed and approved by his supervisor who would decide whether to pass on proposed changes to others for implementation.

Finally, because Rivard's supervisor had the authority to change the underlying "logic" or "coding" in Revstream and Rivard did not, Rivard was responsible for reviewing the "configuration modification report" that documented any changes or modifications to Revstream, so that the supervisor was not reviewing his own work.  (*Id.* at 307-08.)

Rivard's work with respect to the close process was far removed from the process of preparing Verint's public filings.  As noted above, the Controller Group was responsible for the preparation of Verint's SEC filings and that group operated independently of the Business Finance Unit in which Rivard worked.  Rivard's work relating to revenue or deferred revenue figures for VIS would be reviewed and analyzed by the Controller Group in the course of preparing the Company's public filings.  Verint's Controller Group included three regional controllers, supervised by Verint's Global Revenue Team at the corporate level, who in turn supervised the country controllers.  At quarter end, each country controller would close the books for the VIS business unit in that country and would prepare its own financial statements. Those statements would then be submitted to the Corporate Consolidation Group within the Controller Group in the Finance Department, which would review and consolidate the combined

19

entities' statements into Verint's financial statements, which were ultimately incorporated into Verint's Form 10-Ks and Form 10-Qs.

### F.      Supporting the Launch of Revstream

From in or around the spring or summer of 2010 through February 2011, Rivard worked as a part of a 10-15 person team to set up the software for "Revstream" and customize it for Verint's use.  (SEC Ex. 6 at 283-84.)  As part of this process, a smaller sub-team led by the Global Revenue Controller and the Director of Business Finance for the VIS Operating Unit (and Rivard's supervisor) and including Rivard and several others, developed new "Decision Trees" for Revstream that (1) reflected the changes in GAAP and FASB, and (2) could be applied to contracts with different underlying product, element, and region combinations.  (*Id.* at 284-87.) Rivard worked also as part of another sub-team, led by these same individuals, that identified particular types of transactions that Revstream would be required to flag and place on "hold" status.

Prior to implementation, the larger team worked together to test Revstream and correct any "bugs" within the system.  (*Id.* at 288-89.)  Rivard and others used various methods to test the system and to evaluate whether it was functioning properly, including running mock transactions through Revstream to assess whether it could properly apply the revenue recognition rules set forth in the Decision Trees.  (*Id.* at 289-90.)  Rivard did not select the transactions to be tested.  Rivard was part of a team that identified problems in Revstream and discussed potential solutions to fix the "bugs."  To the extent that Revstream was unable to properly recognize particular types of transactions, Verint's IT department and Revstream – not Rivard – devised specific fixes, at times with Deloitte's assistance.  Rivard was involved in conveying these issues and possible fixes to the relevant personnel assisting in the building of Revstream, but he did not decide on the appropriate fix.  (*Id.* at 297-98, 299-300, 304-05.)

### G.  Updating Verint's Revenue Recognition Memos

Both before and after becoming a full-time employee, Rivard was tasked with updating Verint's revenue recognition memos on an annual basis to reflect any new revenue recognition rules and regulations promulgated pursuant to GAAP or FASB, or any changes in Verint's internal rules and procedures.  (*Id.* at 151-52, 275-76.)  From 2011 to 2014, Rivard updated two different types of revenue recognition memos: (1) a VIS Global Product Revenue Recognition Memo, initially prepared by a Protiviti consultant in the form of several memos that were subsequently compiled into one larger Memo, that described Verint's global accounting policy relating to revenue recognition for VIS products (*id.* at 275); and (2) memoranda that summarized the revenue recognition policy for specific product lines and customers of Verint. (*Id.* at 151-52.)

Prior to preparing an updated draft of the policies, Rivard typically met with the VP and Global Revenue Controller and Rivard's supervisor, who explained to Rivard how to document the new rules (if any) and how those rules applied to Verint.  (*Id.* at 278-80.)  Rivard was given a copy of the previous year's memorandum and directed to update it to reflect changes in revenue figures and any changes in accounting policies.  Rivard prepared a first draft, for review and approval by his supervisor, the Global Revenue Controller, the SVP of Business Operations for the VIS Operating Segment, and on occasion, Verint's Chief Financial Officer. (*Id.* at 276.)  A substantial amount of Rivard's work on the policies involved obtaining and including sales volumes for different products for the relevant year, updating other numerical information in the memorandum, making changes to the relevant dates, and if applicable, documenting changes in processes within specific regions of the VIS business.  (*Id.* at 277-78.) Substantive updates with respect to rule changes pursuant to GAAP and FASB were very rare. (*Id.* at 277.)

These policy memoranda served a dual purpose: they were prepared for Verint's internal files and they were used to assist Deloitte in its audit of Verint's financial statements.  In the drafting process, various versions were circulated to Deloitte for its review and comment. (SEC Ex. 31.)

### H.    Communicating with Deloitte

Deloitte, Verint's external auditor, regularly communicated with Rivard and his supervisor during the course of its audit of the Company's financial statements.  Rivard's supervisor conveyed to Deloitte that he (the supervisor) was the main point of contact for the auditors for supporting documents, questions and requests for analysis.  Deloitte's normal practice was to direct any questions to Rivard's supervisor, particularly where the questions were of a substantive nature or called for analysis of accounting issues.  (SEC Ex. 6 at 196-97.) Deloitte would go directly to Rivard only if his supervisor was unavailable or the matter was straightforward; even then, the supervisor typically was copied on email communications between Deloitte and Rivard.  Rivard usually did not meet with the Deloitte representatives outside the presence of his supervisor, especially when substantive, complex accounting matters pertaining to revenue recognition were discussed.  (*Id.* at 196.)  Those discussions usually involved a combination of the VP of Business Finance, the VP and Global Revenue Controller, the SVP of Business Operations for the VIS Operating Segment, the Director of Business Finance for the VIS Operating Segment, and occasionally the Protiviti consultants.  (*Id.*)

Rivard's dealings with the external auditors were generally not of a substantive nature.  (*Id.* at 197-98.)  In the majority of his communications with Deloitte, Rivard did no more than respond to requests for various samples, files, memoranda and other documents needed in the audit process.  (Ex. I; Ex. J.)  Rivard would simply compile and transmit these materials, which had already been reviewed and approved by his supervisor.  (Ex. N at 111.)  On occasion,

Rivard responded to straightforward questions from Deloitte on his own, either in person or by email, without his supervisor being present or copied.  (SEC Ex. 6 at 196-98.)  Any substantive discussions with Deloitte on significant issues, however, would involve Rivard's supervisor and the Global Revenue Controller as well, (*id.* at 197; Ex. N at 112) – both of whom Rivard understood often met with the auditors outside of Rivard's presence.

## ARGUMENT

### I.  Rivard Did Not Violate the 102(e) Order Imposed in October 2004

As an initial matter, the Commission's claim that all of Rivard's activities during the five-year period that he was employed at Verint were prohibited by the 102(e) Order is not entitled to deference.  The Commission's interpretation of Rule 102(e) itself has "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).[6]  *Seminole Rock* requires a court applying a regulation to consider its plain language, and any prior adjudications or interpretations of the agency that administers that regulation.  *See id.* at 413-14.  However, no such deference should be afforded to the Commission's conclusion that the activities in which Rivard engaged while employed at Verint violate Rule 102(e).

The Commission's factual findings, as well as its legal conclusions, only receive deferential judicial review when made in a formal administrative proceeding.  *See Nat'l Labor Relations Bd. v. Brown*, 380 U.S. 278, 292 (1965) (deference to be afforded to agency determinations of fact, where there is substantial evidence to be found in the record as a whole); *Heath v. SEC*, 586 F.3d 122, 131 (2d Cir. 2009) (stating the reviewing court should set aside

---

[6]   The Commission states that "[f]ederal district courts have accorded deference to the Commission's interpretation of 'practicing accounting' as articulated in *Armstrong*."  (SEC Mem. at 18.)

agency actions, findings, and conclusions that are found to be "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'" (citation omitted)).  But where, as here, the Commission has not made findings pursuant to a formal adjudication in an administrative proceeding, the Commission's factual assertions, as well as its legal conclusions, should be viewed as mere allegations and should not be afforded deference.[7]  Because the Commission has elected to proceed via application to this Court, and not by an administrative proceeding, the Commission's allegations should be treated no differently than allegations made by any other litigant.

Rivard respectfully submits that the Court should reject the Commission's allegations and, relatedly, its request for disgorgement.  The Commission's claims mischaracterize Rivard's role at Verint and far overstate the scope of Rivard's Rule 102(e) bar.  Rivard was a support-level employee without authority to make accounting determinations for Verint and his substantive accounting and other judgments were subject to close supervisory review.  He was too far removed from the process of preparing Verint's public filings for his conduct to constitute "appearing or practicing before the Commission as an accountant."  While Rules 102(e) and 102(f) are not limited to those who actually sign or draft a company's public filings, no one working at Rivard's level and executing the tasks that he performed has ever been found in violation of Rule 102(e).  As set forth below, while Rivard is prepared to resolve this

---

[7]   In this posture, the Commission is no different from a civil prosecutor who brings a civil action in federal court for an authoritative adjudication of liability.  *See Kelley v. Envtl. Prot. Agency*, 15 F.3d 1100, 1106 (D.C. Cir. 1994) (holding that where the EPA brings a cost recovery action against responsible parties to recover contamination cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), this is "no different, however, than any government 'prosecutor' who must in good faith determine for itself whether a civil action in federal court should be brought – which necessarily includes a judgment whether a potential defendant violated the law or is 'liable.'  The court is, nevertheless, the first body to formally determine liability, and therefore a civil prosecutor typically lacks authority to issue substantive regulations to interpret a statute establishing liability.").

case and consent to the allegation that he violated the 102(e) Order imposed in October 2004, Rivard will be forced to contest these charges if no settlement can be reached.  Indeed, his conduct should not be the basis for any disgorgement, much less the significant amount sought by the Commission.[8]

### A. Rivard's Activities at Verint Do Not Constitute Practice Before the Commission As an Accountant

The Commission alleges that Rivard has violated the terms of the 102(e) Order that permanently barred him from "appearing or practicing before the Commission as an accountant," pursuant to 17 C.F.R. § 201.102(e)(3)(i).  In substance, the Commission contends that all of the tasks executed by Rivard during his consultancy and employment at Verint – either separately or taken together – crossed the line between permissible employment and prohibited activities.  (SEC Mem. at 19-20.)  As we further set forth below, this contention misapprehends the reach of a 102(e) Order.

As the District Court recently made clear in *SEC v. Prince*, 942 F. Supp. 2d 108 (D.D.C. 2013), "violation of this prohibition requires two elements.  First, an individual must 'appear[] or practice[] . . . as an accountant.'  Second, such action must have occurred 'before the Commission.'"  *Id.* at 145-46 (alterations in original) (citation omitted).  Contrary to the Commission's contention, only a narrow subset of Rivard's activities while employed at Verint even arguably walks close to this line.  The vast majority either do not meet the definition of "practicing as an accountant" under Rule 102(e) or cannot be said to have occurred "before the Commission" because they lack a sufficient relationship to the Commission's filings.

---

[8]   As set forth in Section II below, the Commission's request for disgorgement should also be denied because Rivard cannot afford, and likely will never be able to afford, disgorgement in the amount sought by the Commission.

While some of Rivard's work at Verint had an attenuated relationship to the financial statements in Verint's public filings, the 102(e) Order does not prohibit engagement in any activity that can be said to impact public filings in some way. To the contrary, Rule 102(f) defines "practicing before the Commission" to include, as relevant here, "[t]he preparation of any statement, opinion or other paper by any . . . accountant . . . filed with the Commission in any registration statement . . . report or other document with the consent of such . . . accountant." *See* 17 C.F.R. § 201.102(f)(2) (2015). "Practicing" thus is defined to include "preparation" of written work – whether a statement, opinion or other paper – which itself is filed with the Commission or included in another document that is filed with the Commission. On its face, the Rule contemplates that to practice before the Commission one must compose, draft or compile written work, and that work thereafter must be included in a Commission filing.

To be sure, the language of Rules 102(e) and 102(f) leaves many questions unanswered. As the Commission itself has noted, there is "inherent difficulty [in] enumerating every position . . . that would be prohibited by, or consistent with" a 102(e) Order. *In the Matter of James M. Schneider, CPA*, Exchange Act Release No. 69922, 2013 WL 3327751, at *6 (July 2, 2013) (Order denying motion to clarify scope of Rule 102(e) Order and to identify permissible positions for an accountant subject to such an Order). The Courts have recognized this difficulty and have refused to adopt the SEC's view that "'practicing accounting' goes beyond [activities such as] 'creating, compiling, or editing' data or information that is incorporated into financial statements, and includes any editorial review of the statements." *Prince*, 942 F. Supp. 2d at 148 n.25 (citation omitted). The Commission emphasizes in its application and memorandum that Rivard's various activities constitute "participat[ion] in Verint's financial reporting process" (SEC Application at ¶¶ 2-3; SEC Mem. at 20) but Rule 102(e) does not prohibit a barred

accountant from any participation in the financial reporting processes of a public company.  As

the Court in *Prince* noted, "[t]he SEC's position is vulnerable to the criticism that it is far too

broad because it could arguably encompass anyone, including non-accountant executive officers

and directors, who identified typographical errors or engaged in editorial review of public

filings."  942 F. Supp. 2d at 148 n.25.

               What is clear is that the only persons who have previously been found to

"practice" within the meaning of Rule 102(e) operated at levels substantially senior to Rivard

and were far more substantively involved in the public filing process.  For example, in

*Armstrong*, the defendant was the chief accounting officer of a significant subsidiary of a public

company.  *In the Matter of Robert W. Armstrong, III*, Exchange Act Release No. 51920, 85 SEC

Docket 2321, 2005 WL 1498425, at *2-3 (June 24, 2005).  He "computed the amounts of income

needed to be held in reserve to achieve [the public company's] targeted growth rates, prepared

the materially false financial reports based on these figures, and submitted this information to

[the public company] knowing that [the public company] would incorporate it into its

Commission filings."  *Id.* at *11.  In *SEC* v. *Jones*, the defendant allegedly:

> among other things, created, compiled, and edited financial statements,
> information and data incorporated into Forms 10-K, 10-Q and 8-K; drafted and
> edited footnotes to financial statements; drafted and edited Management
> Discussion and Analysis ("MD&A") sections of public filings; . . . and provided
> issuers with accounting advice that was subsequently reflected in financial
> statements filed with the Commission.

Complaint ¶ 2, *SEC v. Jones*, No. 1:13-cv-00163-BSJ (D. Utah filed Nov. 21, 2013), ECF No. 2.

In *Prince* itself, the defendant, among many other acts, "[made] accounting judgments that

affected the actual numbers that went into the financial statements," acting, in effect, as a senior

member of his company's accounting department during the period of time when the company's

Chief Financial Officer was on maternity leave.  *Prince*, 942 F. Supp. 2d at 150.

Compared to the defendants' conduct in *Armstrong*, *Jones* and *Prince*, Rivard's role and tasks at Verint are of limited scope and significance. Rivard was closely supervised by more senior Verint employees, and the accounting judgments he made generally involved the application of rules designed by others that Rivard could not change and in which he had no input. As the Court in *Prince* recognized, determining the permissible borders of what conduct is and what conduct is not subject to a Rule 102(e) bar is a "challenging question," *id.* at 148 n.25, but the Commission plainly reaches too far here in asserting that all of Rivard's activities while at Verint violated the bar.

To establish a violation, the Commission must establish not only practice as an accountant, but also the second element – that the challenged acts "occurred 'before the Commission.'" *Prince*, 942 F. Supp. 2d at 146 (citation omitted). In contrast to the Commission's expansive construction of the 102(e) Order in this matter, the language of Rule 102(e) proscribes only a particular group of activities. The Commission did not pass a rule prohibiting certain persons from working in public companies. Nor did the Commission prohibit such persons from using their accounting training and skills on behalf of a public company. Rather, Rule 102(e) was promulgated to "protect[] the integrity of the Commission's own processes, as well as the confidence of the investing public in the integrity of the financial reporting process." *Marrie v. SEC*, 374 F.3d 1196, 1200 (D.C. Cir. 2004).

In other words, the 102(e) Order did not prohibit Rivard from using his accounting skills at a public company such as Verint. Rather, it only prohibited him from playing a significant role in the series of tasks undertaken for the "express purpose" of public company financial reporting. *See Armstrong*, 2005 WL 1498425 at *11. In *Prince*, for example, the District Court concluded that a number of the defendant's activities, including attending

Board meetings and tutoring directors and staff members on financial issues, had no relationship to public filings. *Prince*, 942 F. Supp. 2d at 146 n.22. For this same reason, a number of Rivard's tasks that the Commission has identified simply do not constitute prohibited activity because they are not actions that occurred "before the Commission."

### 1.   Many of Rivard's Activities Did Not Occur Before the Commission

In alleging that all of Rivard's activities at Verint were in violation of the 102(e) Order, and in seeking disgorgement of all compensation Rivard received from Verint, the Commission impermissibly seeks to extend the Rule 102(e) bar to activities that have virtually no relationship to Commission filings and thus do not occur "before the Commission" even though they may involve the use of accounting skills.

### (a)   Rivard's Participation in Drafting and Updating Verint's Policies and in the Set-Up of Revstream Did Not Occur Before the Commission

Rivard's drafting and updating of Verint's accounting policies do not constitute practicing "before the Commission." Verint's policies are not filed with the Commission nor are they incorporated into Commission filings.[9] Accordingly, preparation of policies does not constitute the preparation of documents to be filed with the Commission, nor can policies be described as "information or data incorporated into [filings with the Commission]." *Prince*, 942 F. Supp. 2d at 147. Therefore, Rivard's drafting and updating of Verint's policies did not violate Rule 102(e), notwithstanding the fact that the policies were accounting-related.

Rivard's work on the policies was not tantamount to making accounting judgments about data incorporated into Commission filings. *Cf. Prince*, 942 F. Supp. 2d at 148 (finding that Prince made accounting determination regarding bonus accrual and instructed that

---

[9]   Certain of Verint's accounting policies are referred to in Verint's public filings by title and topic and general descriptions of certain policies are included in the filings. Rivard was not responsible for drafting or editing those portions of the public filings.

this number be reflected in financial statements later filed with the SEC).  Rivard made updates to policies but was not responsible for the application of those policies to figures included in Verint's publicly filed financial statements.  Finally, Rivard did not determine the content of Verint's accounting policies more generally.  *Cf. id.* (finding that Prince was actively engaged in the making of complex decisions involving the exercise of accounting judgments).  To the contrary, his work on the policies either was ministerial (updating dates and figures) or subject to specific directives from his direct supervisor, the Director of Business Finance, and the Global Revenue Controller (describing new accounting rules or new company policies and procedures). (SEC Ex. 6 at 277, 280-81.)  On the rare occasions where Rivard prepared a first draft of one of Verint's policies – for example, of the Related Party Transaction Policy – his draft was essentially a collection of relevant samples and information about Verint's existing approach.[10] (*Id.* at 248-49, 250-51.)  Rivard's participation in the drafting of Verint's accounting policies was minor, ministerial and far afield from any filings with the Commission.

Similarly, Rivard's role as part of a team at Verint working to transition from a manual revenue recognition process to an automated one, using the software application Revstream, did not constitute practicing "before the Commission."  Launching a computerized program is of course very far afield from preparing documents incorporated into public filings or public filings themselves.  To the extent that the transitional work included determinations about how Revstream would be instructed to apply the new GAAP and FASB revenue recognition rules, such work was also remote from any Commission filings.  In any event, the Director of Business Finance and the Global Revenue Controller supervised that process and served as the

---

[10]   Rivard's work in this respect falls outside Rule 102(f)'s definition for another reason – the Related Party Transactions Policy was not an accounting policy.

principal decision-makers.  Rivard was simply a member of the team.  Similarly, Rivard's participation in the team that set up and tested Revstream, and that developed the circumstances in which Revstream would "hold" or flag a transaction, did not occur "before the Commission" as this work was similarly distant from the preparation of Commission filings.

### (b) Rivard's Review of Revenue Recognition Determinations Did Not Occur "Before The Commission"

Rivard's revenue-recognition work at Verint – which occupied the majority of his time from the fall of 2009 through February 2011 and continued until he left Verint in April 2014 – also did not occur "before the Commission."  This work took two forms:  (1) a contract-by-contract review of a spreadsheet reflecting the booking of customer orders in the VIS Operating Segment to confirm that the proper revenue recognition rules had been applied to those orders,[11] and (2) the completion of contract-specific Checklists that documented revenue recognition determinations for all contracts over a threshold amount.[12]

---

[11]  Post-Revstream, Rivard was tasked with reviewing transactions placed on "hold" in the system to determine whether the transactions should be released in Revstream.  (SEC Ex. 6 at 319-20.)  Rivard conducted fact-based research about the specific transactions which generally did not involve the application of accounting rules, (*id.* at 322-23), and recorded his releases in a spreadsheet.  Rivard's supervisor, the Director of Business Finance, reviewed these "holds" on the spreadsheet and decided whether or not to post the transaction to the General Ledger.  (*Id.* at 320-22, 323-24.)  Rivard had no authority to post a transaction to the General Ledger under any circumstances; only the Director of Business Finance was able to do this.  (*Id.* at 329-30.)  The task of reviewing "holds" was generally not accounting-related, and in any event, did not constitute the preparation or editing of data to be included in a document to be filed with the Commission.  This conduct plainly does not violate the 102(e) Order.

[12]  Prior to taking on these responsibilities and for approximately three months while serving as a consultant, Rivard reviewed Verint's historical contracts from 2006, 2007 and 2008 and divided them into different categories based on their elements, according to pre-set rules.  This exercise, in which non-accountant consultants were also involved, was conducted so that thereafter proper revenue recognition rules could be applied to the contracts.  The task did not require Rivard to apply revenue recognition rules (or any other accounting rules) to these contracts or to calculate any figures with respect to them.  Nor did Rivard's work generate documentation that was subsequently incorporated into Commission filings.  As such, this task cannot be described as preparation of data or information to be incorporated into documents filed with the Commission, nor did it require Rivard to act as an accountant, and it did not violate the 102(e) Order.

These everyday tasks were part of the orderly operation of Verint's sales process and were not closely related to Commission filings. First, Rivard was making proposals with respect to revenue recognition for particular contracts, on a contract-by-contract basis. He was not making recommendations relating to Verint's public filings, Verint's consolidated financial statements, or even the financial statements of particular business units within VIS. *Cf. Armstrong*, 2005 WL 1498425 at *11 (Armstrong prepared false financial reports and submitted the information for incorporation into the company's Commission filings). And, consistent with his role in the close process, Rivard had no authority to edit, or to request that edits be made to, the business units' General Ledgers (let alone to the business units' financial statements) as a result of his revenue recognition review and analysis. *Cf.* Complaint ¶ 2, *SEC v. Jones*, No. 1:13-cv-00163-BSJ (D. Utah filed Nov. 21, 2013), ECF No. 2 (defendant allegedly edited financial statements, drafted and edited footnotes to financial statements, and drafted and edited MD&A sections of public filings). To the contrary, Rivard could propose substantive changes to the business units' revenue recognition determinations only with supervisory review and approval, and even then his proposals were advisory only and subject to the final review and determination of the VP of Business Finance, or the international controllers. For this reason as well, Rivard's work did not constitute preparation of documents to be filed with the Commission and was quite attenuated from Commission filings.

Second, Rivard's recommendations, which reached the business units only after they had been reviewed and approved by his supervisor, were many steps away from the preparation of the quarterly financial statements for those business units. That preparation was a separate process in which the controllers in the relevant countries, supervised by Verint's Controller Group, reviewed and analyzed the relevant figures and prepared the financial

32

statements for each business unit within VIS.  Each business unit's financial statements would in turn be consolidated and rolled up into the financial statements for the VIS Operating Segment, and those financial statements would then be consolidated into Verint's financial statements by the Consolidation Group and ultimately incorporated into Verint's public filings.  Rivard was not a member of the Controller Group or the Consolidation Group and there is no indication that he ever directed or asked anyone in those groups to include particular data or reflect a particular accounting determination in Verint's consolidated financial statements or public filings.  *Cf. Prince*, 942 F. Supp. 2d at 150 (finding that defendant acted, in effect, as a senior member of the company's accounting department when the Chief Financial Officer was on maternity leave, making accounting judgments "that affected the actual numbers that went into the financial statements").  Thus, unlike the defendants in prior cases such as *Armstrong*, *Jones* and *Prince*, Rivard's accounting-related activities were far removed from the Commission filings, and did not violate the 102(e) Order.

Third, consistent with his other responsibilities at Verint, Rivard's role in the revenue recognition process was limited and controlled.  Before Revstream, Rivard reviewed revenue recognition determinations to ensure that they complied with the applicable "Decision Tree" document – a step-by-step guide to revenue recognition that Rivard did not prepare and which he had no authority to revise.  Both before and after the launch of Revstream, Rivard described the revenue recognition treatment for certain contracts over a threshold amount that he reviewed by filling out Checklists.  Once Revstream automated the manual application of revenue recognition rules to transactions, Rivard's role was to review transactions that were incorrectly processed in Revstream or placed on "hold" in the system.  If Rivard decided to release the "hold" in Revstream, he would document this, along with a description of the

transaction, in a spreadsheet that he presented to his supervisor at the end of each week.

Rivard's supervisor would then review the spreadsheet and decide whether or not to cause the

revenue from that "held" transaction to be reflected on the General Ledger.  With respect to all

three types of tasks, Rivard's role was simply to summarize and to present the key aspects of

revenue recognition determinations made by others or by Revstream, noting any errors he

identified to supervisors at Verint for their review.  The task of describing and reviewing

transactions generally did not require Rivard to make any independent accounting judgments.

To the extent that he reviewed transactions for proper revenue recognition treatment pre-

Revstream, he applied pre-determined rules set out in the Decision Trees and did not make any

independent revenue recognition determinations.

    The Commission mistakenly elevates Rivard's role in the revenue recognition

process by claiming that he was responsible for explaining revenue recognition rules to others at

Verint and for assisting Internal Audit in documenting the risks and internal controls in the

revenue process.  As an initial matter, the giving of such explanations is not the equivalent of

"filings with the Commission."  *See Prince*, 942 F. Supp. 2d at 146 n.22 (giving "tutorials on

financial issues to Directors and members of [company] staff has no relationship to public

filings").  Furthermore, these tasks were consistent with Rivard's subordinate role.  He signed

sub-certifications that simply confirmed whether certain internal control processes were in place.

(SEC Ex. 23a-k.)  In addition, he communicated with Internal Audit about the nature of those

processes, including by providing Internal Audit with process documentation as requested.  (SEC

Ex. 25.)  These documents, which described internal process controls in the VIS business, were

reviewed and approved by the Director of Business Finance, or another supervisor, prior to

transmission to Internal Audit.  (SEC Ex. 6 at 84, 192; Ex. N at 58-60.)  The record does not

34

support the conclusion that Rivard controlled, designed or otherwise played a supervisory role in those processes.

The Commission's contention in this regard places undue weight on the description of Rivard as a "Process Owner" in a flow chart that documents Verint's revenue recognition processes. (SEC Ex. 24b.) The chart itself makes clear, however, that Rivard was junior to the other "process owners" identified on the document, such as the VP and Global Revenue Controller and the Director of Business Finance, who were required to review and approve his work. As Rivard explained when initially asked to sign a "process owner" certification: "my only concern is whether I am truly the 'Process Owner' as [my supervisor] also prepared the attached [process owner] form and I report to him on all revenue recognition matters." (Ex. K.) Indeed, Rivard communicated to Internal Audit his proposed changes to the revenue recognition process only after reviewing those proposals with his supervisor and obtaining his approval. Rivard did not in any sense control Verint's revenue recognition processes and furthermore, those processes were so attenuated from the Commission filings that Rivard's involvement in them did not occur "before the Commission" and therefore did not violate the 102(e) Order.

### 2. Rivard's Other Tasks Generally Did Not Constitute "Practicing" Before the Commission

The remainder of Rivard's tasks also did not constitute "practicing" before the Commission within the meaning of Rule 102(f), and as set forth in *Armstrong*, because they did not involve the preparation of documents to be filed with the Commission or the preparation of data for inclusion in such documents.

        **(a)**      **Rivard's Involvement in the Quarterly Close Process Is Not "Practicing" In Violation of the 102(e) Order**

Rivard's tasks surrounding the quarterly close process are too attenuated from Commission filings to be described as the preparation of financial statements, within the meaning of Rule 102(f). Rivard was responsible for a number of tasks relating to the quarterly close process both before and after the implementation of the Revstream system. In conducting these tasks, Rivard was not "practicing" before the Commission and his work did not violate the 102(e) Order. To the extent that Rivard's work had any bearing on data that was ultimately incorporated into Verint's financial statements, his work was so attenuated from the public filings that it cannot be deemed "'*creating, compiling or editing* information or data'" incorporated into Commission filings, and thus does not constitute "practice" within the meaning of *Armstrong* and *Prince*. *See Prince*, 942 F. Supp. 2d at 147 (citing *Armstrong*, 2005 WL 1498425, at *11).

First, Rivard's work in this area was in large part administrative – a rote comparison of figures in an effort to identify non-reconciling items, followed by research with respect to any discrepancies identified. The work generally did not require the application of accounting rules. Rivard performed several different types of analyses in connection with the close process, with the overall goal of reconciling the General Ledgers to the trial balances for the various VIS business units and to other types of supporting documentation. For example, he was tasked with confirming that changes that his supervisor recommended to the revenue recognition for contracts reviewed in the prior quarter were reflected in the General Ledger (pre-Revstream) and also that transactions previously placed on "hold" by Revstream had been released to the General Ledger (as directed by his supervisor). (SEC Ex. 6 at 169; *cf. Prince*, 942 F. Supp. 2d at 118-19 (Prince regularly reviewed and commented on draft filings by asking

36

questions, asking for backup related to particular figures, pointing out internal inconsistencies, suggesting additional language, deletions, or rephrasings, adding information or correcting information related to mergers and acquisitions, and changing numbers related to future forecasts).

   Second, to the extent that Rivard concluded, based on the reconciliation processes and his spot checks, that substantive edits should be made to financial data that he had reviewed, he did not have the authority to make those changes or to direct that those changes be made in the General Ledger; his supervisor was required to approve Rivard's proposals before Rivard could make any recommendations.  (*See, e.g.*, Ex. F; Ex. G.)  The majority of close-related tasks were handled within Business Finance and did not require additional input from the business units prior to Rivard's supervisor's final approval.  For those tasks, Rivard's supervisor reviewed the relevant files or reports after Rivard completed his review and, if he concurred with Rivard's proposals, the supervisor would direct that the proposals be passed along to the VP of Business Finance (for business units within the Americas), or the international controllers (for the other business units).   They were in turn responsible for reviewing any recommendations and, if they concurred, directing that a journal entry be posted to the General Ledger.[13]   Certain aspects of

---

[13] With respect to the short-term/long-term netdown report, Rivard's supervisor, the Director of Business Finance, required input from the local business units to complete his review.  Therefore Rivard sent the report, along with his preliminary comments and proposals, to his supervisor and to the business units simultaneously.  After the business units provided input, his supervisor would review that input (if any) and Rivard's proposals (if any) and thereafter give his final approval.  Then, his supervisor would transmit, or direct Rivard to transmit, any further proposals or recommendations to the VP of Business Finance or the relevant international controller.  Thus, before the short-term/long-term netdown report (and any changes proposed by Rivard) could be approved, Rivard's supervisor was required to review and approve it, consistent with the supervision of Rivard's other substantive work.  (SEC Ex. 6 at 339; Ex. H.)  An example of Rivard's performance of this task is his review of the netdown report for the Asia Pacific business unit and his correspondence with the local accounting team member regarding reclassifying short-term deferred revenue as long-term deferred revenue.  (SEC Ex. 6 at 212-15; SEC Ex. 28.)  Rivard's supervisor, along with the SVP of Business Finance for Asia Pacific, and the VP and Global Revenue Controller, were included on the exchanges, and Rivard's supervisor had to review both Rivard's comments and the business unit's input before giving his approval.

the German entity's unique close process required Rivard to provide additional analysis of the revenue recognition determinations in Germany and to correspond with the European office. However, as with his other tasks, Rivard could not make changes to the General Ledger and he could not direct the international controller to make those changes unless and until his supervisor had reviewed and approved Rivard's proposed changes.  In all of these close-related tasks, Rivard could not even make edits to the General Ledger, let alone make changes to a business unit's financial statements – which were prepared under the supervision of controllers responsible for Verint's public filings through a separate process.  As such, Rivard's work does not constitute "preparation" of documents to be filed with the Commission within the meaning of Rule 102(f).

Third, there is no indication that Rivard sought to ensure that any revenue-related determinations (or other determinations) that he made were reflected in Verint's publicly filed financial statements.  Rivard did not, for example, direct that members of the Controller Group or Consolidation Group within Business Finance include any particular figures in Verint's public filings.  Indeed, there is no evidence that Rivard ever contemplated using his role in the close process as an opportunity to impact Verint's public filings.  (SEC Ex. 6 at 345.)  Rivard's close-related work is thus distinguishable from the conduct of the defendants *Armstrong* and *Prince*, both of whom made particular, purposeful efforts to ensure that their proposed changes to their subsidiary's financial statements were reflected in the consolidated financial statements included in the public filings.  *See In the Matter of Robert W. Armstrong, III*, Exchange Act Release No. 51920, 85 SEC Docket 2321, 2005 WL 1498425, at *11 (June 24, 2005); *SEC v. Prince*, 942 F. Supp. 2d 108, 149 (D.D.C. 2013).

Fourth, Rivard was not a decision-maker at Verint and his work in connection with the close process does not evidence any authority over Verint's close-related processes.  For example, Rivard assisted in the "deferred revenue reporting project," one aspect of Verint's efforts to reduce the length of the closing period beginning in March 2013.  (SEC Ex. 6 at 346.) This project called for modifications to the short-term/long-term netdown report to capture additional information (all manual transaction types) that previously was not included in the report in order to speed up the preparation of the netdown report.  Rivard's role was to assist the IT department in its effort to capture that additional information.  (*Id.* at 352-54.)  Rivard's close-related work, which was subject to careful supervision and in large part administrative, does not qualify as preparing documents to be filed with the Commission and does not violate the 102(e) Order.

**(b)      Rivard's Limited Communications with Deloitte Do Not Constitute "Practice" Within the Meaning of Rule 102**

Rivard's interactions with Deloitte do not constitute "practicing" before the Commission because they do not involve preparation of documents to be filed with the Commission, or preparation of data for inclusion in such documents, as required by Rule 102(f) and set forth in *Armstrong*.  Rivard's interactions with Deloitte had, at most, a minimal substantive impact on Deloitte's audit of Verint's publicly filed financial statements.  Indeed, the vast majority of Rivard's interactions with Deloitte were administrative – Rivard simply compiled and transmitted to Deloitte, at his supervisor's direction, data that Deloitte requested to conduct its audit.  (*Id.* at 197-98; Ex. I; Ex. J.)  The materials transmitted generally were drafts of revenue recognition memoranda which Rivard had helped prepare, as well as other data that Deloitte requested to test the accuracy of various aspects of the financial statements.

Rivard at times participated in responding to Deloitte's questions about the documents or data.  Typically, his supervisor participated in or was copied on these communications, which in any event generally were limited to conveying information and analyses that the supervisor had already reviewed and approved.  For example, Rivard provided explanations to Deloitte by referring to existing policies or to established VIS processes and outcomes of those processes, which his supervisor had already vetted.  (*See, e.g.*, Ex. L (Rivard responded to Deloitte's question regarding Revstream holds and releases by reference to applicable policies); Ex. M (Rivard explained portions of the VIS Global Product Revenue Recognition Memo which he updated and his supervisor approved).)  If the auditors had straightforward questions that did not raise complex accounting issues, Rivard would respond directly to Deloitte without his supervisor's involvement.  (SEC Ex. 6 at 196-98.)  Rivard's communications with Deloitte were consistent with his junior and largely administrative role at Verint.  Rivard's communications with the outside auditors do not qualify as "practicing accounting" because the discussions were generally of an administrative nature and did not, and were not intended to, impact or influence Deloitte's audit.  The communications do not qualify as "preparation" of reports or documents to be filed with the Commission and the communications do not violate the 102(e) Order.[14]

---

[14]   Recent Commission allegations are not to the contrary.  The Commission has recently alleged that a defendant violated a 102(e) Order by engaging in "financial statement preparation work" for public companies by "communicating" with a public company's independent auditors and answering their questions as the auditors reviewed the financial statements.  *See* Complaint ¶ 13, *SEC v. Jones*, No. 1:13-cv-00163-BSJ (D. Utah filed Nov. 21, 2013), ECF No. 2.  But that was only one component of the allegations, which described responsibilities with respect to public company financial statements that go well beyond Rivard's work at Verint.  Among other things, Jones allegedly made and adjusted journal entries and then ran reports from those entries to generate financial statements.  He also ensured that the financial statements were accurately incorporated into SEC filings.  *Id.*

**(c)      Rivard's Work on Two Footnotes in Verint's Restated 10-K Did Not Violate the 102(e) Order.**

Rivard's "fact-checking" of two footnotes in Verint's Restatement, while more closely related to Verint's public filings than Rivard's other tasks, was limited in time, scope and significance and do not amount to preparing a document to be filed with the Commission. Rivard's contribution to the content of the footnotes was limited.  The footnotes subsequently were subject to extensive review and modification by others.  Furthermore, Rivard worked on these footnotes for a tiny fraction of his time at Verint – no more than approximately two months and he did not work continuously on the footnotes during this period – and only a very small portion of his salary was attributable to this work.  We are unaware of any other case in which the Commission has based an enforcement action solely on conduct of this nature.

Rivard's limited and subordinate role in preparing these footnotes bears mention. First, Rivard did not draft these footnotes, (SEC Ex. 6 at 49); he merely confirmed the accuracy of the numerical information they contained and proposed any necessary edits.  *Id.* at 46; *cf. Prince*, 942 F. Supp. 2d at 118 (one of Prince's responsibilities included writing a first draft of the MD&A section of the company's Form 10-Q and Form 10-K filed with the SEC).  The metadata for each footnote draft, and Rivard's testimony, reflect that the documents initially were drafted by others.  (SEC Ex. 6 at 44; SEC Ex. 17; SEC Ex. 18.)  The "Investments" footnote was created more than two weeks before Rivard first accessed it and likely modified nine times before he accessed it, including by a senior Verint employee – the Chief Accounting Officer of Verint at that time.  (SEC Ex. 17.)  The "Special Charges" footnote was also modified initially by the Chief Accounting Officer, and subsequently, per the metadata, "[a]djusted for some comments from Dave Rivard."  (SEC Ex. 18.)  Thus, the metadata confirms that Rivard did not draft either footnote.

41

Second, Rivard's work on the footnotes was limited to confirming that the numbers in the footnotes were accurate, after collecting supporting documentation and comparing the footnote with that documentation and making any necessary changes to the numbers.  (SEC Ex. 6 at 48 ("I might have made sure that the sum of all three of those separate schedules . . . when you add up all three, add up to the number in the financial statement that had already been prepared.").)  One of the draft footnotes required a change to one number in the footnote that did not agree with the documentation, and Rivard proposed changing "a word" in that footnote as well.  (*Id.* at 68.); *cf. Armstrong*, 2005 WL 1498425 at *11 (Armstrong computed the amounts of income needed to be held in reserve to achieve targeted growth rates and prepared the materially false financial reports based on these figures).

Third, Rivard was not the final editor of the footnote documents.  According to the available metadata, both footnotes were "modified by" many others at Verint, including the Company's Chief Accounting Officer and Senior Accounting Manager, on numerous occasions after Rivard last accessed the documents.  (SEC Ex. 17; SEC Ex. 18.)  Furthermore, Rivard did not control the content of the footnote that ultimately was incorporated into the Restatement.  At least one change to the language of the footnote that Rivard proposed ultimately was not incorporated into the final document, (SEC Ex. 16b), and Rivard appears to have sent a draft of the "Investments" footnote with his handwritten mark-up (along with the support he had collected) to a Senior Accounting Manager, presumably so that she could review his work and make any necessary changes.  (SEC Ex. 6 at 242-43; SEC Ex. 20.)  Indeed, the final filed versions of the two footnotes differ in significant ways from the versions of each footnote identified by the Commission as the versions last accessed by Rivard.

Indeed, the fact that Rivard was tasked with this matter in the first instance only serves to emphasize the distinction between his role and the role of the defendants in *Armstrong* and *Prince*, who each had substantial decision-making authority in their respective entities' public filings. *See, e.g.*, *Prince*, 942 F. Supp. 2d at 118-19 (defendant violated 102(e) bar when he drafted pre-earnings press releases that were incorporated into public filings); *Armstrong*, 2005 WL 1498425 at *2 (defendant who was responsible for subsidiary's financial reporting violated Rule 102(e) when he knowingly submitted reports containing false figures for the subsidiary to the parent entity and then reviewed the parent entity's public filings to insure that his false figures had been incorporated).  While two recent Commission Complaints have included allegations relating to the preparation of financial statement footnotes included in public filings, the financial statement work performed in those cases – both as to the footnotes and as to other types of work on the public filings – is far more substantial than the work Rivard performed here.[15]

### 3.    Disgorgement Should Not Be Ordered.

For the reasons set forth above, the vast majority of Rivard's activities while at Verint do not violate the 2004 Commission Order because they do not constitute practicing accounting before the Commission within the meaning of Rule 102(e) and disgorgement should not be ordered here.  Disgorgement is an equitable remedy, *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) ("Disgorgement is an equitable remedy, imposed to force a defendant to give up

---

[15]   *See* Application at ¶¶ 11, 21, *SEC* v. *Taber*, 1:13-mc-00282-KBF (S.D.N.Y. filed Aug. 8, 2013), ECF No. 1 (defendant allegedly edited and drafted footnotes, prepared income statements and statements of cash flow, provided multiple issuers with accounting advice that was subsequently reflected in their filed financial statements, and worked on various sections of one issuer's Form 10-K); Complaint ¶ 2, *SEC v. Jones*, No. 1:13-cv-00163-BSJ (D. Utah filed Nov. 21, 2013), ECF No. 2 (defendant allegedly edited and drafted financial statement footnotes, performed a host of other accounting work such as making and adjusting journal entries, drafting and editing the MD&A narratives in companies' Forms 10-K and 10-Q, and reviewing, revising and approving financial statements and other financial information in public filings).

the amount by which he was unjustly enriched." (alteration omitted) (citation omitted) (internal quotation marks omitted)); and disgorgement in the amount that the Commission seeks is unwarranted.  As an initial matter, disgorgement should be ordered only with respect to compensation paid for activities that actually violated Rule 102(e).  *See Contorinis*, 743 F.3d at 305 (noting that it is well established that "the court may only exercise its equitable power only over property causally related to the wrongdoing" (citation omitted) (internal quotation marks omitted)); *SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96 (2d Cir.), *supplemented*, 115 F. App'x 105 (2d Cir. 2004) (the amount of disgorgement is determined by the amount of profit realized); *SEC v. Tourre*, 4 F. Supp. 3d 579, 591 (S.D.N.Y. 2014) (holding disgorgement of one-ninth of bonus warranted where such a portion was attributable to relevant conduct).[16]

Furthermore, disgorgement is not appropriate where, as here, Rivard lacks the financial ability to pay the disgorgement amount sought, as well as prejudgment interest. Disgorgement generally is based on the amount of ill-gotten gains, but courts commonly take into account a defendant's ability to pay, as well as other relevant circumstances, in determining the appropriate amount of disgorgement.  *See SEC v. Elliott*, No. 09 CIV. 7594(RJH), 2011 WL 3586454, at *10 (S.D.N.Y. Aug. 11, 2011) (noting that a district court "'has broad equitable power to fashion appropriate remedies'" (citation omitted)); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (in deciding whether an award of prejudgment interest is warranted, the court considered, *inter alia*, "'fairness and the relative equities'" (citation

---

[16] As the District Court in *SEC* v. *Taber* recently explained, when determining the appropriate disgorgement amount, it is necessary to "separate[] out those amounts which are attributable to a violation of 102(f) from those amounts which are not."  Transcript of October 2, 2013 Hearing at 12, *SEC v. Taber*, No. 1:13-mc-00282-KBF (S.D.N.Y. filed Mar. 12, 2014), ECF No. 21. *See also* Memorandum Decision & Order at 3 n.3, *SEC v. Taber*, No. 1:13-mc-00282-KBF (S.D.N.Y. filed Dec. 4, 2013), ECF No. 19 (noting that in proposing a disgorgement amount, "the SEC represents that it did not include compensation associated with non-SEC-reporting work").

omitted)); Memorandum Decision & Order at 7, *SEC v. Taber*, No. 1:13-mc-00282-KBF (S.D.N.Y. filed Dec. 4, 2013), ECF No. 19 (court considered defendant's poor health, unemployment, and his lack of understanding that his conduct violated the 102(e) order in reducing the disgorgement amount requested by the Commission by $400,000).

## II. Civil Contempt Is Not An Appropriate Remedy For Non-Payment of the 2004 Final Judgment

This Court should decline to hold Rivard in civil contempt for Rivard's failure to satisfy the 2004 Final Judgment. The Commission is correct that Rivard has made no payments toward the judgment amount, with the exception of approximately $16,000 that has been applied to the judgment from an intercepted federal tax refund in approximately March 2008 and from garnishment of Rivard's wages between September 2008 and March 2009. (SEC Mem. at 9.) But because Rivard lacks the ability to pay the $83,700 amount that the Commission demands (the disgorgement and prejudgment interest ordered in the 2004 Final Judgment), civil contempt is not an appropriate remedy.

While a court may enforce compliance with a lawful order by holding a party in civil contempt, *see Equal Emp't Opportunity Comm'n v. Local 638...28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir. 1985), where the party is absolutely unable to comply due to poverty and insolvency, inability to comply is a complete defense. *See Badgley v. Santacroce*, 800 F.2d 33, 37 (2d Cir. 1986); *see also SEC v. Whittemore*, 691 F. Supp. 2d 198, 209 (D.D.C. 2010) (refusing the SEC's request that defendants be required to pay a judgment within ten days or be held in contempt, because "[g]enerally, a court should not find someone in contempt if that person lacks the ability to comply with the order"), *aff'd*, 659 F.3d 1 (D.C. Cir. 2011); *SEC v. House Asset Mgmt., LLC*, No. 02-2147, 2004 WL 2126318, at *1 (C.D. Ill. Sept. 17, 2004) (refusing the SEC's request for a timetable for a payment obligation because the

45

defendant "would be subject to contempt proceedings should he fail to pay in a timely

fashion. . . . [and] the Court cannot find someone in contempt if they lack the ability to comply

with the order"). Civil contempt is not intended to be punitive but rather coercive and where, as

here, there is no "realistic possibility" that sanctions will compel compliance, such sanctions

should not be imposed. *See Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172

(2d Cir. 1998). The alleged contemnor bears the burden "to establish his inability clearly,

plainly, and unmistakably." *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995).

   Rivard should not be held in civil contempt because, in light of his clearly

established inability to pay, there is no realistic possibility that the contempt sanction will

compel compliance. Rivard is easily distinguishable from the defendant in *SEC v. Musella*, 818

F. Supp. 600 (S.D.N.Y. 1993), on which the Commission relies. (*See* SEC Mem. at 24). In

*Musella*, the court found that the defendant had "made no showing that he [was] incapable of

making any payment" and that "[h]e must pay what he is capable of paying, even if making the

payment results in diminution of his income or his relatively comfortable standard of living."

818 F. Supp. at 602.

   The *Musella* defendant's monthly income exceeded his monthly expenses by

approximately $1,200 per month. *See id.* at 605. In contrast, as Rivard's Financial Statement

establishes, Rivard's total monthly income is $13,219, while his total monthly expenses are

$15,676, leaving Rivard more than $2,000 short each month. (Ex. A at 12-16.)[17] The *Musella*

defendant and his wife had a number of means available to reduce their expenses and increase

their income, such as driving less expensive cars, limiting gifts to their grandchildren, and

---

[17] Although Rivard's calculation of monthly expenses over a 12-month period includes some non-recurring
expenses, such as the cost of home repairs necessitated by a flood in late 2013/early 2014, Rivard also
anticipates that he will have additional recurring monthly expenses within the next 18 months, including the
cost of health insurance payments and student loan repayments. (Ex. A at 16.)

renting out a fully-equipped apartment in which their grandson was living rent free.  *See Musella*, 818 F. Supp. at 610-611.  Rivard and his family have a very modest lifestyle and no comparable ways to reduce expenses.  Rivard presently earns $5,000 per month before taxes, plus a $5,000 draw (an advance against future anticipated commissions) and any commissions in excess of the draw amount (though Rivard has only earned small commissions in excess of the draw amount).[18]  While Rivard's wife is seeking a position as a public school teacher, their prospects of substantially increasing their income in the immediate future are dim at best.

Furthermore, unlike the *Musella* defendant, Rivard does not have substantial assets that he can liquidate in order to pay the Commission.  The *Musella* defendant had an ownership interest in a motel note and owned a Florida condominium and a home in Queens jointly with his wife, who also owned a jewelry store.  *See Musella*, 818 F. Supp. at 603.  Rivard's principal assets are his home, owned by his wife, in which the family has just over $50,000 in equity and his 401(k) plan – valued at $267,863.[19]  (Ex. A at 1.)  Rivard's liabilities include his mortgage, over $10,000 in car loans, over $27,000 in credit card debt and a child support obligation.  (*Id.* at 2.)  Rivard's wife also owes almost $80,000 in student loans, with payment due to begin in late 2015 or early 2016.  (*Id.* at 2, 7.)  As Rivard's Financial Statement

---

[18]     Thus far, the $5,000 draw has been non-recoverable, meaning that if Rivard does not earn $5,000 of commissions in a given month, he is not required to pay back the excess portion of the draw with future commissions.  It is unclear how long the non-recoverable status of the draw will be in place.

[19]     Rivard's 401(k) plan is exempt from seizure pursuant to the Employee Retirement Income Security Act's ("ERISA") anti-alienation provision.  *See* 29 U.S.C. § 1056(d)(1).  In *Guidry v. Sheet Metal Workers National Pension Fund,* the Supreme Court held that any attempts to garnish pension benefits to satisfy a judgment, even where the beneficiary committed criminal acts, were barred by ERISA Section 1056(d)(1).  *Guidry,* 493 U.S. 365, 376 (1990) ("ERISA erects a general bar to the garnishment of pension benefits from plans covered by the Act.").  While the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3613(a) – which provides that "[n]otwithstanding any other Federal law (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property of the person fined" – has been held to reach ERISA-protected assets, *see United States v. Irving*, 452 F.3d 110, 126 (2d Cir. 2006), the MVRA applies only to restitution obligations and criminal fines.

47

makes clear, his liabilities exceed his assets by approximately $100,000.  (*Id.* at 2.)  Because

Rivard does not have the present ability to pay the portion of the 2004 Final Judgment that the

Commission demands, this Court should not hold Rivard in civil contempt and should not

require Rivard to purge that sanction through payment.[20]

## III.    This Court Should Not Order an Asset Freeze or An Accounting

Rivard has already provided the Commission – and now is providing to the Court

– an accounting of his current assets and liabilities.  In light of the authorities set forth above,

that information is sufficient for this Court to assess whether a civil contempt sanction is

appropriate here and no further accounting is required.[21]  This Court should also decline to order

an asset freeze.  As set forth above, Rivard has virtually no liquid assets and he has provided the

Commission and the Court with an accounting of those assets.  Thus, a freeze of Rivard's limited

assets would not provide assurance "that any funds that may become due can be collected," the

principal purpose of a freeze.  *SEC v. Unified SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990).

However, an asset freeze would significantly interfere with the Rivard family's ability to pay

their basic expenses such that "the disadvantages and possible deleterious effect[s] of a freeze"

---

[20]    The Commission makes a number of allegations with respect to the financial statements that Rivard submitted
to Treasury's Financial Management Service in 2009, 2010 and 2011, in connection with Rivard's efforts to
negotiate a fixed payment schedule for the 2004 Final Judgment.  (SEC Mem. at 10-13.)  Rivard takes issue
with the Commission's characterization of his statements, but in any event, Rivard's financial status in 2011 and
in prior years has little if any bearing on Rivard's current ability to satisfy the judgment imposed in November
2004.  Therefore this Court need not address those allegations in order to conclude that Rivard should not be
held in contempt of court and should not be required to purge that contempt through payment of the
disgorgement and prejudgment interest penalty in the 2004 Final Judgment.

[21]    The Commission also seeks "an accounting for the moneys [Rivard] obtained from violating the 2004
Commission Order."  (SEC Mem. at 25.)  Putting aside the fact that an accounting, spanning at least a five-year
period, would be quite burdensome, the Commission has not made clear the purpose of such an accounting.
Rivard has provided information to the Commission and to the Court about his current financial status.
Information about his financial status or disposition of assets in prior years is irrelevant to his current ability to
pay the amount ordered in connection with the 2004 Final Judgment and therefore no such accounting is
required.

far outweigh the benefits.  *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir.

1972).  In these circumstances, an asset freeze should not be ordered.  *See id.* at 1102.

## <u>CONCLUSION</u>

For the foregoing reasons, Rivard respectfully submits that the Commission's

application should be denied in its entirety.

Dated:   New York, New York
         April 29, 2015

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

*John Carroll /AM*

John K. Carroll (john.carroll@skadden.com)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorney for David Rivard

50