UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Petitioner,

-against-

DAVID RIVARD,

Respondent.

15 Misc. 0221
ECF CASE

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

DAVID RIVARD,

Defendant.

04 Civ. 1464 (ILG)
ECF CASE

**SEC REPLY MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ENFORCEMENT OF 2004 COMMISSION ORDER AND 2004 FINAL JUDGMENT**

SECURITIES AND EXCHANGE COMMISSION
Alexander M. Vasilescu
John Graubard
Danielle Sallah
New York Regional Office
Brookfield Place, 200 Vesey Street, Room 400
New York, NY 10281-1022
Tel.: 212-336-0178 (Vasilescu)
Fax:212-336-1353
E-mail: Vasilescua@sec.gov

## TABLE OF CONTENTS

I. RIVARD SHOULD BE HELD IN CIVIL CONTEMPT FOR FAILING TO PAY DISGORGEMENT AND PREJUDGMENT INTEREST ..... 1

A. The Applicable Law ..... 2

B. Rivard Has Purposely Evaded His Obligations Under the 2004 Final Judgment and Fails to Demonstrate an Inability To Make Payments ..... 2

II. RIVARD'S WORK AT VERINT VIOLATED THE 2004 COMMISSION ORDER ..... 5

A. Violations of Rule 102(e) Turn on the Tasks Performed, Not the Position Held ..... 6

B. Rivard Performed Substantive Accounting Work Directly Related To Verint's Filings With the Commission Regarding Revenue Recognition ..... 6

CONCLUSION ..... 10

Table of Authorities

Cases

*Cordius Trust v. Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512 (S.D.N.Y. 2009) ........................................ 2

*Huber v. Marine Midland Bank*, 51 F.3d 5 (2d Cir. 1995) ........................................ 2

*Matter of Robert W. Armstrong III*, Release No. 2264, 2005 WL 1498425 (June 24, 2005) ........................ 6

*SEC v. Bilzerian*, 112 F. Supp. 2d 12 (D.D.C. 2000) ........................................ 2

*SEC v. Prince*, 942 F. Supp. 2d 108 (D.D.C. 2013) ........................................ 6, 7, 8

*SEC v. Solow*, 682 F. Supp. 2d 1312 (S.D. Fla. 2010) ........................................ 2

*SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132 (S.D.N.Y. 2008) ........................................ 2

*SEC v. Zubkis*, No. 97 Civ. 8086, 2003 WL 22118978 (S.D.N.Y. Sept. 11, 2003) .............................. 2, 5

In opposition, Rivard refuses to take responsibility for his decade-long failures to comply with the monetary sanctions of this Court's 2004 Final Judgment and with the 2004 Commission Order, barring him from practicing as an accountant before the Commission. For the reasons below and in the Commission's opening papers, the Court should find Rivard in contempt of its 2004 Final Judgment and issue an order enforcing compliance with the 2004 Commission Order and ordering disgorgement of Rivard's ill-gotten gains, an accounting and asset freeze.

## I. RIVARD SHOULD BE HELD IN CIVIL CONTEMPT FOR FAILING TO PAY DISGORGEMENT AND PREJUDGMENT INTEREST

Rivard does not dispute that in 2004 this Court ordered him to pay $65,000 in disgorgement and prejudgment interest of $18,700.96, (Opp. at 5),[1] and for over a decade he has not made a single voluntary payment on his obligation, (SEC Br. at 13).[2] And Rivard cannot contradict the Commission's evidence showing that, from the beginning of the Commission's investigation of Computer Associates through today, Rivard has actively sought to evade payment of his debt by transferring his property and earnings to his wife, a corporate entity controlled by his wife, and others. (SEC Br. at 11-13; Supp. Decl. ¶¶ 3, 5-15.)

Devoid of any affidavit from Rivard himself, Rivard asserts that he is unable to make any payment, notwithstanding his age of 48, earning capacity, and family assets exceeding liabilities. (Opp. at 44-48.) But Rivard's alleged inability to pay is self-created. And the information contained in his latest sworn financial statements, dated April 9 and 28, 2015, is suspect, incomplete, and shows expenses he can cut and assets he can liquidate. (Supp. Decl. ¶¶4-15.)

---

[1] This Court also ordered Rivard to pay a civil penalty of $75,000. The Commission may not enforce payment of a civil penalty by contempt, but must instead use the remedies available under the Federal Debt Collection Procedure Act, 28 U.S.C. §§ 3001 - 3308.

[2] In March 2008, the Department of the Treasury applied Rivard's income tax refund to the judgment, and recovered some amounts from a wage garnishment between September 2008 and March 2009. The current balance due, including post-judgment interest pursuant to 28 U.S.C. § 1961 at 2.27%, is $102,701.08 (Supplemental Declaration of Danielle Sallah ("Sallah Decl.") (5/6/15) ("Supp. Decl.") ¶24, Ex. 78.)

A. <u>The Applicable Law</u>

The only way Rivard could avoid a finding of contempt is to show "a complete inability, due to poverty or insolvency" to comply with the Court's monetary sanctions. *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995). It is Rivard's burden to make that showing "clearly, plainly, and unmistakably." *Huber* at 10; *SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 134 (S.D.N.Y. 2008). Rivard must pay as much of the 2004 Final Judgment as he can. *See Cordius Trust v. Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512, 517 (S.D.N.Y. 2009). And Rivard cannot assert as a defense an inability to pay if that inability is self-created. *See SEC v. Solow*, 682 F. Supp. 2d 1312, 1327 (S.D. Fla. 2010); *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 17-18 (D.D.C. 2000). The Court should hold Rivard in contempt for failing to pay disgorgement and prejudgment interest as ordered by the 2004 Final Judgment, and set forth conditions for Rivard to purge the contempt. *See SEC v. Zubkis*, No. 97 Civ. 8086, 2003 WL 22118978, at *5-7 (S.D.N.Y. Sept. 11, 2003) (defendant in civil contempt for violating injunction by failing to pay disgorgement to Commission as ordered).

**B. <u>Rivard Has Purposely Evaded His Obligations Under the 2004 Final Judgment and Fails to Demonstrate an Inability To Make Payments</u>**

From before entry of this Court's 2004 Final Judgment to the present, Rivard has hindered, delayed, and defrauded the Commission in its efforts to collect what he owes.

Rivard transferred ownership of a significant asset, his house, right after he received a subpoena and then again after he consented to a final judgment imposing financial liability but before this Court entered that judgment on October 21, 2004. Specifically, Suffolk County records show that Rivard purchased his house on August 5, 2002 for $439,000. (Supp. Decl. ¶3.) On August 27, 2003, Rivard transferred his sole ownership of his house to joint ownership with his wife, (*id.*)—just two days after the Commission staff served a subpoena, dated August 25, 2003, directing Rivard to testify on September 3, 2003, in connection with the staff's investigation of Computer Associates International, Inc. ("Computer Associates") for accounting and securities violations. Then, on May

18, 2004, Rivard transferred his joint interest in the house to his wife. (*Id.*) Only 8 days earlier, on May 10, 2004, Rivard executed his consent to the proposed final judgment holding him liable for disgorgement of $65,000, prejudgment interest of $18,700.96 and a civil penalty of $75,000. Rivard's house at 77 Saddle Rock is now worth about $555,000—over $114,000 than he claims. (*Id.* at ¶ 5.) Rivard's title transfers are fraudulent under Article 10 of the New York Debtor and Creditor Law ("NY DCL") §§ 273-a and 273 *et al*, which, together, prohibit transfers without "fair consideration" after a judgment, regardless of intent and insolvency. *See also SEC v. Allen*, 2014WL 99974 at *5 (N.D. Tex. Jan. 10, 2014) (defendant claiming insolvency who transferred assets in anticipation of judgment may be held in contempt).

In addition, as explained, Rivard made false statements and omissions in sworn financial statements he submitted in 2009 and 2011 to the Department of the Treasury and the Commission in connection with offers to compromise, including his failure to disclose $524,477 that he earned for his consulting work at Verint Systems, Inc. ("Verint"). (SEC Br. at 10-13.) Rivard hid those earnings by diverting them to a then-undisclosed bank account controlled solely by his wife (*Id.*) Rivard now discloses, in sworn financial statements submitted to the Commission in April 2015, that, after his consultancy ended, Verint deposited Rivard's earnings into another bank account controlled by his wife. (Supp. Decl. ¶ 8.) And he now has compensation from his present employer deposited into his wife's account. (*Id.*) Further, Rivard discloses that, between April 2013 and April 2014, he sold vested Verint "RSUs" for $13,937, which he deposited into his wife's account. (*Id.*)

Rivard argues that he is unable to pay any amount toward his debt due to insolvency. But as explained below, Rivard has sufficient assets to pay his debt and, in any case, his alleged insolvency is of his own making due to fraudulent transfers of his principal assets and income. But, by his own calculation, Rivard has sufficient assets to make payment. Specifically, Rivard states in his April 2015 sworn financials that his liabilities total $847,086. (Supp. Decl. ¶ 11.) But he inexplicably includes the

$272,705 owed on the 2004 Final Judgment plus post-judgment interest as of December 30, 2009. (*Id.*) That amount should be excluded, meaning Rivard's assets exceed liabilities by $161,398—more than enough to pay his debt under the Court's Judgment.

Rivard's April 2015 sworn financials are also incomplete, suspect, and include discretionary expenses that could be reduced. *First*, Rivard fails to provide documents showing transactions and transfers between the issuance of the 2004 Final Judgment and the present motion. (Supp. Decl. ¶¶4-15.) The Commission and Court need these records to understand what happened to the nearly $1 million Rivard earned and diverted to his wife. (*Id.* ¶¶8-10; SEC Br. at 11-12.)

*Second*, Rivard's April 2015 sworn financials make no sense. In his statement of "Cash Flow Information," for instance, Rivard claims his monthly expenses of $15,676 exceed monthly income of $13,219, for a net loss of $2,455. (Supp. Decl. ¶ 12.) But Rivard only identifies accounts having $2,338 in cash. (*Id.*) It does not seem possible that he has a deficit of $2,455 each month while having only $2,338 in cash. Rivard also estimates the Fair Market Value (FMV) of his house in East Setauket, New York at $440,000—only $1,000 more than he paid 13 years ago. Rivard claims he based his estimate by comparing the FMVs of seven nearby homes, which he obtained from reports produced by an online real estate service called Zillow. (*Id.*) But Rivard did not use the Zillow report for his own house, which estimates the current FMV of Rivard's house at over $554,000. (*Id.*at ¶5.) As another example, Rivard claims one-time expenses of about $1,000 for a frozen pipe that burst in his house in 2014. (*Id.* ¶14.) But Rivard does not explain why his insurance company paid him over $13,500 for that incident or the whereabouts of the difference. (Supp. Decl. ¶14.) *Third*, many of Rivard's monthly expenses are unnecessary, such as expenses for: four household cars, gifts and

charitable giving, schooling for his wife (despite federal loans) and adult stepson, fitness club, subscriptions, and various unidentified items and supplies.[3] (Supp. Decl. ¶13.)

Finally, an accounting and asset freeze are warranted as for years Rivard used the corporate form and his wife to hide income and assets at his disposal. *See SEC v. Zubkis*, 2003 WL 22118978, at *5-7 (ordering freeze of all assets owned or controlled by defendant where he had used protections of corporate form to hide assets at his disposal).

## II. RIVARD'S WORK AT VERINT VIOLATED THE 2004 COMMISSION ORDER

Rivard does not dispute that he performed the individual tasks the Commission alleges he performed during his tenure at Verint. Nor does Rivard dispute that his work at Verint was substantially similar to his work at Computer Associates, which led to his 2004 criminal conviction. (SEC Br. at 3, 8.) Rather, Rivard argues that he did not violate the 2004 Commission Order because: (1) he did not hold a position of authority over any document that Verint filed with the Commission; (2) the tasks he performed did not require him to make accounting judgments and were attenuated from Verint's financial statements; and (3) the tasks he performed were supervised.[4] (Opp. at 27-30.) Rivard's arguments have no basis in law or fact.

---

[3] Rivard's current sworn financial statements reveal that he made yet another misrepresentation to the Treasury Department and the Commission in 2009. In 2009, Rivard claimed that he was paying for his wife's educational expenses from "savings/credit cards/family loans." (Supp. Decl. ¶15.) Rivard thereby increased the amount of his expenses, decreasing his disposable income. But Rivard now discloses that federally guaranteed student loans paid for his wife's education, which he and his wife do not have to begin to pay back until 2016. (Opp. at 47; Supp. Decl. ¶ 15.)

[4] Rivard mischaracterizes the Commission's point that federal district courts afford deference to an agency's interpretation of its own rules and regulations. (Opp. at 23-24.) The Commission does not assert, as Rivard incorrectly claims, that the factual allegations against Rivard should be afforded deference. The Commission asserts only that this Court should afford deference, consistent with precedent, to the Commission's interpretation of the meaning of Rules 102(e) and (f). (SEC Br. at 19.)

### A. Violations of Rule 102(e) Turn on the Tasks Performed, Not the Position Held

Rivard essentially asks the Court to narrow the scope of Rule 102(e) to particular positions and titles, rather than conduct, falling within its scope, as defined by Rule 102(f). According to Rivard, the "preparation" of a document filed with the Commission under Rule 102(f) excludes, as a matter of law, those who review and make suggestions on accounting treatments unless done by senior-level employees who have final authority to include those suggestions in a Commission filing. (Opp. at 27; SEC Br. at 20.) But that argument was rejected by the United States District Court for the Southern District of New York in *SEC v. Prince*, 942 F. Supp. 2d 108, 148 (D.D.C. 2013) (declining to identify particular accounting positions that would violate Rule 102(e) inquiry is a question of fact and turns on the specific tasks the accountant performed, regardless of position).

Instead, a person "participate[s] in the preparation of" a document under Rule 102(f) by creating, compiling, or editing information or data for inclusion in financial statements filed with the Commission. *Matter of Robert W. Armstrong III*, Release No. 2264, 2005 WL 1498425, at *11-12 (June 24, 2005) (Commission opinion). The law is also clear that a person may create or compile information or data by making non-quantitative suggestions regarding accounting treatments—such as the recognition of revenue—even if *rejected* by those with final authority to implement the suggestions. *Prince*, 942 F. Supp. 2d at 147. The tasks Rivard performed at Verint fall squarely within the scope of Rule 102(e), as defined by Rule 102(f) and as interpreted by Commission precedent and federal district court decisions. (SEC Br. at 19-21.)

### B. Rivard Performed Substantive Accounting Work Directly Related To Verint's Filings With the Commission Regarding Revenue Recognition

The record shows that Rivard provided substantive revenue recognition work for Verint that directly related to Verint's Commission filings. (SEC Br. at 4-9.) Executives from Verint and Rivard himself testified that Verint specifically hired Rivard in 2009 because the company needed his revenue recognition expertise to help the company restate several years of financial reports. (Supp.

Decl. ¶16; SEC Br. at 4.) At the time, Verint's external audit firm had refused to certify the company's financials due in part to weaknesses in internal controls specifically over revenue recognition. (Supp. Decl. ¶16.) Verint's external audit firm, according to the company's Audit Committee Chairman, had directed it to "re-interpret[] the revenue recognition for software contracts." (*Id.*) Because Verint lacked sufficient revenue recognition expertise and "had trouble finding people who understood the rev[enue] rec[ognition] process," Verint hired Rivard based on the recommendation of its Chief Financial Officer, Doug Robinson, who had worked with Rivard at Computer Associates. (*Id.*) And Rivard admits that the work he performed at Verint was similar to the work he performed at Computer Associates, which was substantive accounting work relating to revenue recognition and which led to his criminal conviction in 2004. (SEC Br. at 8.)

As a consultant, Rivard worked directly under Verint's most senior financial executives—the Senior Vice President of Corporate Finance, Controller, and Chief Accounting Officer—and the head of revenue recognition. (*Id.* 4.) He edited two revenue-related financial footnotes for inclusion into Verint's restated financial filings. (*Id.* 8; Supp. Decl. ¶17.) Substantive accounting work on revenue-related footnotes for inclusion in financial statements falls squarely within the scope of Rule 102(e) and defined by Rule 102(f) and precedent. *Prince*, 942 F. Supp. 2d at 148-150. Rivard also prepared Verint's Related-Party Transactions policy (SEC Br. at 5), the significance of which he downplays. (Opp. at 30.) That accounting policy, which Rivard provided directly to the Chief Financial Officer and Chief Legal Officer for approval, (Supp. Decl. ¶¶19-21), detailed how the company would *record*—under GAAP and Commission regulations—and *report* revenue generated from related-party transactions. (*Id.*) Rivard knew that it was "critical" for Verint to incorporate the policy into its annual reports on Form 10-K, which it did. (Supp. Decl. ¶21; SEC Br. at 7.)

Rivard does not dispute that he performed the specific business finance tasks alleged by the Commission. (Opp. at 6-23.) Throughout his tenure in the VIS Business Finance Division, Rivard

analyzed the judgments that accounting employees made in applying GAAP revenue recognition rules to revenue generated from the company's software contracts—just as he did at Computer Associates. (*Compare* SEC Br. at 3 *with* 6-9.) In conducting his analyses, Rivard made his own judgments and communicated them to the accounting employees, his supervisor, and other senior-level finance employees. (Supp. Decl. ¶18 (Verint's CFO testified that Rivard "was coaching people" concerning journal entries for revenue recognition); SEC Br. at 6-8.) Verint's CFO even testified that Rivard and his supervisors acted as a "team" and that "no one person [made] any determination" about how and when to record revenue in the division's books. (Supp. Decl. ¶18.) Rivard also does not dispute that he communicated directly with Verint's external audit firm in connection with the annual audit of Verint's financial statements. (Opp. at 22.) He admits that at least some of his communications with the audit firm were substantive, as emails offered by the Commission show. (*Id.*)

Rivard instead attempts to escape a finding that he violated the 2004 Commission Order by inaccurately downplaying the above-described work. For example, Rivard claims his work on the footnotes was limited to "fact-checking." (Opp. at 8-9, 41.) But Verint would not have hired Rivard specifically for his revenue recognition expertise which the company lacked, pay him $130 per hour for that expertise (SEC Br. at 4), and then task him with mere "fact-checking." And Rivard offers no evidentiary support for his contention. Rivard also argues that his work on the footnotes was attenuated from the financial statements because myriad others worked on the footnotes too. (Opp. at 9, 41-43.) But as the *Prince* court recognized, the relevant question concerns the work that Rivard performed, not the work that others performed. *Prince*, 942 F. Supp. 2d at 150.

Rivard admits that he performed the specific business finance tasks alleged by the Commission but argues that those tasks did not involve accounting-related judgments, and were attenuated from Verint's financial filings. (Opp. at 25-27, 31-36.) Rivard even characterizes himself

as having been a "support-level employee." (*Id.* at 24.) None of that is true because, as explained, Rivard made judgments that impacted how revenue was recorded and communicated those judgments up and down the financial reporting chain. (SEC Br. at 6-7.)

Significantly, Rivard does not dispute the fact that he oversaw revenue recognition determinations made by controllers at Verint's German subsidiary because the sales contracts in Germany required a unique and complex revenue recognition analysis that only he understood. (*Id.* at 7.) The automated system could not properly recognize revenue without instruction on which GAAP rules to apply and how and when to apply them. (*Id.* at 8.) And Rivard does not dispute that he provided those instructions to the RevStream software company. (Opp. at 30.)

Rivard also attempts to minimize his role of interacting with Verint's auditors, claiming—without any evidentiary support—that substantive communications with the audit firm were "rare" and that, regardless, such communications were attenuated from the company's financial statements. But the record shows that Rivard defended the financial results recorded by his division, and the sufficiency of supporting documentation, when questioned by the company's audit firm, including about the materiality of particular transactions. (SEC Br. at 9; Sallah Decl. (2/5/15) ¶¶34, 36-39.) Rivard even took the lead in persuading Verint's external audit firm that his division sufficiently implemented its revenue controls. (Sallah Decl. (2/5/15) ¶34.)

Finally, Rivard pins his defense on his claim that he was subject to supervision, arguing without evidentiary support that such supervision eliminated any impact his work could have had on decision-making. (Opp. at 34.) Not so. In hiring Rivard, just as in *Prince*, 942 F. Supp. 2d at 114-15, Verint purported to create safeguards designed to ensure that Rivard would not be involved with the accounting department or accounting data that impacted the financial statements. (Supp. Decl. ¶22.) But Verint's internal audit manager testified that the audit department did not, and was not asked to, place restrictions on Rivard's work while he was consultant. (*Id.*) In fact, she testified that Verint did

not even have a process for documenting revenue controls during the time Rivard served as a consultant. (*Id.*) Rivard helped the new audit department create revenue controls and became responsible for implementing those controls when he joined the VIS Division. (*Id.* at 21, 23; Sallah Decl. (2/5/15) ¶35.) In other words, Rivard helped create and apply the very controls that should have restricted him. (*Id.*) And Rivard offers no evidence—not even an affidavit—that Verint actually imposed meaningful restrictions or subjected his work to heightened supervision. In truth, Rivard performed his work without restriction, instructing accountants to reclassify revenue based on his discretionary analyses, advising his supervisor about the material impact of transactions on the company's financials, and, whether alone or with his supervisor, defending his team's revenue recognition determinations when questioned by Verint's external audit firm.

**CONCLUSION**

For the reasons above and in the Commission's opening papers, this Court should grant the Commission's Application and enforce compliance by Rivard with the 2004 Commission Order, 2004 Final Judgment, hold Rivard in contempt of the 2004 Final Judgment, order an asset freeze, and direct Rivard to provide an accounting.

Dated: New York, New York
May 6, 2015

Respectfully submitted,

Alexander M. Vasilescu
Attorney for Petitioner
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Room 400
New York, NY 10281-1022
Tel.: 212-336-0178 (Vasilescu)
Fax:212-336-1353
E-mail: Vasilescua@sec.gov

Of Counsel:
John J. Graubard
Danielle Sallah